**UNITED STATES of America**

v.

**Bobby Edward BELL.**

**Crim. No. 80–0040.**

United States District Court, District of Columbia.

March 31, 1980.

H. Lowell Brown, Asst. U.S. Atty., Washington, D. C., for United States.

Matthew W. Black, Rockville, Md., for defendant Bell.

MEMORANDUM

GESELL, District Judge.

The police conducted a search of a small one-room apartment without a warrant and arrested defendant who was in the apartment at the time. Indicted for a drug violation as a result of physical evidence

obtained by the search, defendant has now moved to suppress. After hearing testimony from two police officers and considering the arguments of counsel, the Court has concluded that the motion must be granted.

Pertinent facts developed are as follows. At about 6:00 p.m., on a Thursday in late December, Detective Penberg received a telephone tip from an informer who had provided information in the past. The informer reported having seen a woman deliver an extra large shipment of phenmetrazine from Detroit to an apartment on the third floor of a rooming house in the 1200 block of U Street located immediately to the east of a game room. The address and number of the apartment-room were unknown. Explicit directions were given as to where the room was located, including the floor, the turns to make from the landing, and the fact that the room in question opened onto the rear of the building. The informer also advised that the phenmetrazine was being distributed by a man named "Mike" who was selling from a stash under a pinball machine in the game room and that "Mike" was controlled by a "Bobby" and a "Baby Dee." After conferring with his Sergeant, who apparently felt the need of further information before a warrant could be obtained, Penberg, in company with other officers, went to the area in plain clothes to investigate and develop more information.

The police arrived at the area around 6:30 p.m. Because Penberg was known in the neighborhod, another officer was sent into the game room to see if "Mike" was there and upon his entry he was then closely followed by Penberg and other officers. A person matching "Mike's" description was not present but Penberg found a stash of phenmetrazine under the pinball machine. The officers withdrew and after conferring out of the area for a brief time they decided to investigate further.

On returning to the area an individual precisely matching the description of "Mike" obtained from the informer was seen to exit from 1205 U Street, the apartment rooming house immediately to the east of the game room. He was not arrested or questioned. The officers went to the main outside door of 1205 U Street at about 7:10 p.m. and found it locked. Penberg then went to the rear of the building and identified an open window on the third floor as the probable window of the suspect apartment. The officers noted that a roof immediately under the window was bare.

In the meantime, Sgt. Gonzalez, Penberg's partner, stood next to the front door and entered when the door was unlocked from inside to admit someone else. Having thus gained entry and after making a superficial investigation of the floors, he left but changed the latch so that the outside door would no longer lock, thus permitting later entry by the police at will. When Penberg returned from his examination of the rear of the building, he, Gonzalez and two other police officers entered and went to what proved to be apartment No. 7, following the directions given to Penberg by the informer.

Penberg knocked on the door. A voice from the other side said, "Who is it?". Penberg replied, "Police.", and the voice responded, "Just a minute." Thereafter, the television, which was already on, was turned up to a higher volume and the sound of paper being torn or crumpled was heard by the police. After an interval of close to one minute, a man matching the description of "Bobby" (the defendant) opened the door. When the defendant opened the door he stated in response to questioning that he did not live there and that he did not know who lived there. There was some brief interrogation of defendant, who indicated in a very general way that he had been asked by someone to "watch the place." The apartment consisted of a single room, perhaps fifteen feet square, with a large bed. The window was open. No one else was in the room. Penberg saw a large quantity of clothing stacked on the bed with store price tags showing. He immediately associated this observation with his knowledge that addicts often shoplift and turn in the stolen goods in return for drugs. Penberg's gun was not drawn. Because of

the obvious presence in the room of what appeared to be stolen goods, the indications of concealment by defendant following their knock on the door, and the other suspicious circumstances, the officers entered. They made no request to enter nor did defendant make any effort to prevent them from entering by word or action. Penberg approached and looked out of the open window. He saw a packet of what appeared to be drugs on the roof immediately below the window where there had been nothing before. As soon as another officer confirmed that the packet contained drugs, the defendant was placed under arrest for a drug offense. The defendant was not formally arrested prior to that time but Penberg and Gonzalez believe, and the Court finds, that the officers would not have permitted the defendant to leave pending further inquiry.

After concluding that the defendant had thrown the drugs out of the window, the officers conducted a thorough search of the apartment, finding a briefcase with $457 in it, money in a shaving kit, women's suits and fur coats with store tags attached, and a handgun. In addition, a paper was found with handwritten figures totalling to a sum of 1,509, corresponding to a slip of paper containing the notation $1,509 that was located with the drugs on the roof. The rejected packet retrieved from the roof contained $1,487 in cash as well as drugs. All of these items, including the packet and its contents, defendant now moves to suppress.

Defendant, whose presence as the sole occupant in a private residential dwelling was apparently by invitation, had a legitimate expectation of privacy in the premises he was inhabiting. See *Rakas v. Illinois*, 439 U.S. 128, 148, 99 S.Ct. 421, 433, 58 L.Ed.2d 387 (1978); *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). The police had probable cause, supported by sufficient particularity, to obtain a search warrant at least by the time their investigation had led them to the door of 1205 U Street. *See generally Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). They chose another course. The Government contends that at this stage they were confronted with exigent circumstances. *United States v. Johnson*, 182 U.S. App.D.C. 383, 561 F.2d 832 (D.C.Cir.1977); *United States v. Robinson*, 174 U.S.App. D.C. 351, 533 F.2d 578 (D.C.Cir.1976). The presence of the police in the neighborhood was known as was the fact that a stash of phenmetrazine had been discovered in the game room and it could be reasonably presumed that "Mike" had noticed the presence of the police when he exited from 1205 U Street.

It does not appear to the Court, however, that these circumstances created an exigent situation. There was no reason to conclude, prior to entry into the building, that any occupants of the targeted apartment were aware of police presence, or even that the apartment was occupied. Although there was a possibility that the drugs believed to be in the apartment would be removed, this was a mere possibility. Moreover, notwithstanding the presence of probable cause to obtain a warrant, the police had not actually seen the suspected large shipment. Unlike *United States v. Johnson, supra*, 561 F.2d at 835, 843, there was no evidence or circumstance to suggest that destruction or disappearance through large-scale dissemination was imminent. Any inference deducible from the solitary distribution in the game room is to the contrary. Neither escape nor violence was present or threatened.

Withdrawal of the police at this stage to obtain a warrant might have lulled any neighbors of suspicions. In deciding not to follow this course but to investigate further, the police, as Sgt. Gonzalez indicated, realized an exigent situation might be created. In fact, this did not occur. The presence of possibly stolen goods in the apartment provided no ground for warrantless entry. There was nothing involved in the confrontation with defendant at the door of No. 7 which justified entry without a warrant unless that entry was by permission. Given the presence of four policemen at the door it is not possible for the Court to infer that entry was by consent.

■ The Court is troubled by the possibility that the locked front door of a rooming house might afford tenants less protection against warrantless police entry than is available to private homeowners. *See United States v. Carriger*, 541 F.2d 545, 550–52 (6th Cir. 1976); *Perkins v. United States*, 432 F.2d 612, 614–15 (D.C.Cir.) (Bazelon, C. J., dissenting), *cert. denied*, 400 U.S. 866, 91 S.Ct. 108, 27 L.Ed.2d 106 (1970). But even assuming *arguendo* that entry by ruse through a locked outside door can be excused on the ground that the corridors of the apartment building were not a privacy-protected area, *cf. United States v. Anderson*, 533 F.2d 1210 (D.C.Cir.1976); *United States v. Perkins*, 286 F.Supp. 259 (D.D.C. 1968), *affirmed*, 432 F.2d 612 (D.C.Cir.), *cert. denied*, 400 U.S. 866, 91 S.Ct. 108, 27 L.Ed.2d 106 (1970), nothing occurred at the door of apartment No. 7 to justify entry. The police having made the choice to investigate rather than proceed by warrant cannot be said to have obtained authority to enter private living quarters. A strong suspicion that drugs were being concealed therein and that the establishment was being used for purposes of drug distribution, coupled with the other circumstances of the case, is not enough to create legal justification for entry without a warrant. Exigency under the Fourth Amendment must be a product of external events, not police ingenuity.

Defendant's motion to suppress is granted. At the status conference set for April 8, at 1:45 p. m., the Court will determine whether or not the indictment is to be dismissed.

SO ORDERED.