Marianne A. **ENGBLOM** and Charles E. Palmer, Plaintiffs,

v.

Hugh L. **CAREY**, Governor of the State of New York, Richard D. Hongisto, Acting Commissioner, New York State Department of Correctional Services, Joseph C. Snow, Superintendent of the Mid-Orange Correctional Facility, Major-General Vito J. Castellano, Chief of Staff to the Governor of New York; New York National Guard, Lieutenant-Colonel Justin M. Queally, an officer of the 106th Maintenance Battalion of the New York National Guard, Captain "John" Drew, an officer of the 101st Signal Battalion of the New York National Guard and Various Officers and Enlisted Men, Members of the New York National Guard, Defendants.

No. 79 Civ. 4785 (RWS).

United States District Court,
S. D. New York.

May 14, 1981.

On Summary Judgment Motion On Subsidiary Claims Sept. 2, 1981.

Ricken, Goldman, Sussman & Blythe, Kingston, N. Y., for plaintiffs; Alan Sussman, Richard Goldman, Kingston, of counsel.

Robert Abrams, Atty. Gen. of the State of New York, New York City, for defendants; Arlene Silverman, Stephen Marcus, Asst. Attys. Gen., New York City, of counsel.

OPINION

SWEET, District Judge.

This motion for summary judgment dramatically returns the parties and the court to the immediate post-revolutionary period. It was in 1791 that the simple and direct prohibition contained in the Third Amendment to the United States Constitution was adopted:

> No Soldier shall, in time of peace be quartered in any house, without the consent of the Owner, nor in time of war, but in a manner to be prescribed by law.

The colonists' outrage over the Quartering Act of 1765 and its successor of 1774 (one of the Intolerable Acts) gave rise to this provision, which can be traced to the English Bill of Rights of 1689 and the constitutions of the newly organized states.[1] From the time of its adoption until September 10, 1979, the date of the filing of this action, as far as can be determined, no citizen has found it necessary to invoke the Amendment to protect his dwelling from use by the military. In an extraordinary demonstration of the vitality and versatility of our Constitution, just such a claim is here made for the first time, albeit unsuccessfully.

Plaintiffs Marianne A. Engblom ("Engblom") and Charles E. Palmer ("Palmer"), correction officers at Mid-Orange Correctional Facility ("Mid-Orange") in Warwick, New York, brought this action under 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331 and 1343(3) and (4) alleging, most significantly, violation of their Third and Fourteenth Amendment rights. The claims arise out of a series of events occurring in April, 1979 when, in response to a statewide strike by correction officers, Governor Carey activated the New York National Guard ("the Guard") to perform security-related functions at state prison facilities, including Mid-Orange. Defendants, besides Governor Carey, are Richard D. Hongisto, Acting Commissioner of the Department of Correctional Services; Joseph C. Snow, Superintendent at Mid-Orange; Mayor General Vito J. Castellano, Chief of Staff to the Governor, New York National Guard; Lieutenant Colonel Justin M. Quelly and Captain Thomas N. Drew, responsible officers of the National Guard contingent ordered to Mid-Orange; as well as other unnamed officers and enlisted men of that contingent. Each plaintiff seeks $1 million compensatory and $1 million punitive damages. After completing discovery the defendants now move for summary judgment. For the reasons set forth below, the bulk of the complaint will be dismissed.

Plaintiffs were among the 35 to 73 Mid-Orange correction officers out of a total force of some 210 who resided in April, 1979 on the grounds of the facility in the so-called upper and lower staff buildings.[2] Both Engblom and Palmer had resided at the upper staff building as employees of the Department for nearly two years antedating the events here at issue. As is apparent from the numbers involved, Mid-Orange correction officers were not required to live on the grounds of the facility as a condition of employment. This housing space had been made available, however, to assure adequate attendance of correction officers at the facility at all times. Engblom and Palmer had applied for and been granted housing space, and the staff building at Mid-Orange became their residence.

The living space at Mid-Orange is akin to a dormitory, consisting of rooms or apartments with semi-private or private baths, and common kitchens. The prison provides the fixtures and standard bed and dresser, with all other furnishings and accessories, from curtains to toilet paper and light bulbs, supplied by the occupants. The occupants apparently were also responsible for cleaning their own rooms. There was a rental charge of $36 per month, which was

---

1. *E. g.* Delaware Declaration of Rights § 21 (1776); Maryland Declaration of Rights § XXVIII (1776). *See* 1 B. Schwartz, The Bill of Rights: A Documentary History 278, 282 (1971).

2. Snow states in his affidavit that there were altogether 73 resident correction officers at the time. Engblom states that there were 35. The statement of facts in plaintiffs' memorandum of law puts the number at "less than 50." The exact figure is of no consequence.

deducted from payroll checks. Engblom and Palmer, as all staff housing applicants, were given and did sign a document entitled Facility Housing—Rules and Regulations ("the Rules").[3] The Rules apparently were promulgated pursuant to a certain

3. That document reads as follows:

The D.O.C.S. [the Department] is pleased to offer "facility housing" to selected employees of the Mid-Orange Correctional Facility. Continued occupancy is predicated upon compliance with established rules and regulations which are subject to revision from time to time.

The subject of "employee housing" has been under consideration by responsible authority in the D.O.C.S. for some time. The Department has established priorities based upon job titles and the needs of the facility for the emergency expertise of certain employees. At the present time, we shall make every effort to comply with the Department's stated criteria. However, it should be apparent to all concerned that the responsibility and authority rests with the Superintendent.

The following rules and regulations relative to employee housing are standard for all facilities in the D.O.C.S.

I. Firearms—of any kind—shall be stored in the facility arsenal—not in occupied facility housing.

II. Intoxicating beverages must be secure under lock and key and out of sight of inmates who may be employed in or near the housing unit. Extreme care must be provided to insure that inmates on maintenance details do not secure access to intoxicating beverages.

III. State owned residences and grounds shall be maintained by the State of New York. Reasonable maintenance and upkeep shall be the responsibility of the facility. Occupants shall be held responsible for damage and/or destruction caused by employee or guests.

IV. Permission to occupy facility housing is granted to the employee and his immediate family. Long-term guests or occupancy by more than one family shall be prohibited. Special permission of the Superintendent may be granted in selected cases.

V. Doors and other entrances shall be secured at any time the residence is not occupied.

VI. In the event an employee occupying facility housing anticipates being absent for an extended period of time (vacation, illness, etc.) the D.S. Security should be informed.

VII. Items permanently installed and/or affixed to a D.O.C.S. residence are and shall remain the property of the State of New York. Prior approval is required to install or permanently affix any item.

VIII. Any conduct relating to D.O.C.S. housing which is considered to be detrimental to the facility or which creates a "nuisance problem" shall be sufficient cause for termination of occupancy, if so indicated after an impartial investigation of the incident.

IX. Residents shall make every effort to conserve heat, light, fuel and water in conformance with D.O.C.S. directives pertaining to these items.

X. Automobiles and all vehicles parked on D.O.C.S. property shall be locked at all times.

Failure to comply with these and other rules and regulations which may be promulgated relating to the occupation of facility housing shall be sufficient cause for termination of occupancy.

Each residence shall be inspected annually during April-May. A copy of the result of this inspection shall be forwarded to the Department Commissioner of Administrative Services.

In addition to the [above] General Housing Rules & Regulations . . ., the following Rules & Regulations are hereby promulgated for Upper and Lower Staff housing.

A. Rooms and quarters in the Upper and Lower Staff Buildings shall be subject to inspection at any time. Occupants shall possess a room key and a closet key. The room key shall be mastered. The closet key shall not be mastered.

B. Rooms and quarters shall be inspected by a supervisor above the rank of Sergeant. Room closets shall be inspected only in the presence of the occupant.

C. Inmates shall not be employed in the cleaning of individual rooms. The occupant is responsible for maintaining the quarters in a clean, sanitary and acceptable condition.

D. Inmates shall be employed in cleaning and maintaining all areas of the Upper and Lower Staff Buildings other than individual employee quarters.

E. Inmates shall not—for any reason—be permitted in the individual rooms or quarters.

F. Rooms and quarters are supplied for the individual employee and only he/she shall occupy same. Under no circumstances shall employees who are assigned quarters in the Upper/Lower Staff Buildings have overnight or long-term "guests."

G. Pets of any kind shall not be permitted in the Upper/Lower Staff Building quarters.

H. Electrical appliances, other than radios, TV's, lamps, etc., shall not be installed or utilized without prior approval of the Plant Superintendent and/or the Deputy Superintendent of Administration.

I. Cars shall be parked in the areas designated—not on the lawns or road.

J. Only those items of State equipment with which the quarters are furnished shall be

Department Directive # 4005 dated January 29, 1976 ("the Directive").[4] These are permitted. Items of furniture in other areas of the Upper/Lower Staff Buildings shall not be removed. Occupants may supplement the State furniture with personal furniture.

K. Violations of "Rules" promulgated for facility housing shall—after investigation—be considered sufficient grounds for curtailing housing privileges.

Joseph C. Snow
Superintendent

I hereby acknowledge that I read and fully understand the above Rules and Regulations relative to facility housing. I further agree that proven violations of said Rules & Regulations shall constitute sufficient grounds for cancellation of "Facility Housing Privileges."

Signed: ―――――――――――
Witness: ―――――――――――

An Addendum to the Rules and Regulations, dated June 13, 1978, over Superintendent Snow's signature, provides:

Housing on facility grounds is granted for the benefit of the facility.

Employees having such housing are expected to report for work and to be on time. Absence and/or tardiness will be considered a basis for removal from such housing.

4. The Directive reads as follows:

I. *Description*:

This procedure is designed to establish guidelines for the administration of Department owned housing.

II. *Housing*:

It is the policy of the Department to supply available Department owned housing to facility employees in accordance with the following priorities and stipulations:

A. Order of priority

1. Facility superintendents as specified in former Section 18.4(c) of the Correction Law.

2. Facility superintendents not included in item 1 above.

3. Deputy superintendents.

4. Facility employees whose presence is desired near the institution.

5. Employees assigned to housing not needed for employees specified in items 1 through 4 above.

B. Order of priority

1. Where sufficient vacant housing is available, the head of the facility is authorized to provide, subject to Central Office approval, Department owned housing to Deputy Superintendents, by seniority within title.

2. Where vacant Department owned housing is available, the Superintendent is authorized to provide, subject to Central Office approval, Department owned housing to employees within groups specified in items A–4 and A–5, by seniority within title and salary grade, according to the following order of priority:

the only documents brought to the attention of the court in the nature of a "lease"

a. Medical Supervisor
b. Security Supervisor—Captain or above
c. Maintenance Supervisor
d. Farm Supervisor
e. Finance Supervisor
f. Other Employees

3. Where a house reserved for a Deputy Superintendent is vacant, it may be offered to employees in B–2 a–f above, subject to the vacating provisions in item C–3 below.

C. Central Office Approval

1. Recommendations for assignment of Department owned housing to facility employees shall be forwarded to the attention of the Deputy Commissioner for Administrative Services for review and approval prior to assignment.

2. It is desirable that Superintendents as defined in items A–1 and A–2 reside in the vicinity of the facility so that they will normally be in a position to be at the facility within one-half hour after notification of an emergency situation. In those cases where suitable housing is not available within the necessary distance, an exception may be obtained by application to the Deputy Commissioner for Administrative Services.

3. When it is desired to rescind the housing privileges granted to employees in items A–4 and A–5 the Superintendent will request permission for this action from the Deputy Commissioner for Administrative Services. Upon receipt of approval the Superintendent shall give such employee a six-month written notice to vacate.

D. Stipulation

1. The Superintendent as defined in II.A–1, who has not elected to be covered by the provisions of the new salary law, is entitled to be allowed rations for himself and his family and to reside in a house provided with household furniture, fuel and lights.

2. Department employees specified in items A–2 through A–5 are required to pay such rent as is established by the Director of the State Division of the Budget under provisions of Section 4(7) of the State Finance Law. See Budget Bulletin B–1011.

3. When heat, electricity or cooking fuel are not provided through the facility, the individual will be required to pay all charges for these services.

4. Employees are not required to live in Department owned housing as a condition of employment. The Department will no longer issue a certification that housing is for the benefit of the employer.

5. Employees living in Department owned housing may not deduct the rental cost from salary for income tax purposes.

6. Repairs to and rehabilitation of housing provided in accord with the provisions of this directive will only be performed in keeping with normal "landlord-tenant" responsibilities and practices.

or otherwise, setting forth the conditions of plaintiffs' occupancy of the staff building premises.

On the morning of April 19, 1979, all but a few correction officers at Mid-Orange joined in a state-wide strike called by the Security and Law Enforcement Employees Council 82, AFL–CIO, in apparent violation of New York Civil Service Law § 210 ("the Taylor Law"). By executive order, Governor Carey thereupon mobilized the Guard, which was then ordered to provide security at various state correctional facilities, including Mid-Orange. Plaintiffs were among those who were not on the job from that morning and for the duration of the strike—until May 3.[5] Neither plaintiff denies defendants' contention, set forth in the affidavit of Snow, that both were active participants in the work stoppage and on the picket line.

Soon after the strike began—on April 19 or April 20—after receiving reports that strikers had been using staff housing to contact, threaten and disrupt the work of personnel still on duty, and that certain acts of vandalism including the destruction of personal property and cutting of a facility TV cable had been committed,[6] Superintendent Snow issued an order barring access to Mid-Orange by correction officers without his permission, except for the purpose of reporting for duty.[7] Officers of the New York State Police, who had been called in to help with security, enforced this order at the prison entrances. On April 21, Snow declared a state of emergency at the prison. As a result of Snow's actions, plaintiffs, among others, were denied access to their apartments, as well as to the administration building where mail was distributed, and

7. All items permanently installed and/or affixed to a Department owned house are and will remain the property of the State. Prior approval is required to install or permanently affix an item per Policy and Procedures Directive # 3053—Alterations/Construction Request.

8. Normal wear and tear in staff housing is acceptable. Damages resulting from other than normal wear and tear are the responsibility of the tenant and he will be charged for necessary repairs.

[There is no paragraph 9 in the original.]

10. Each staff house will be inspected on an annual basis during April or May and before a tenant moves out. A copy of the inspection report will be sent to the Deputy Commissioner for Administrative Services.

11. The Superintendent's house will be inspected by a main office employee. All other staff houses will be inspected by a facility employee and/or main office employee subject to review by the main office.

5. Engblom claims that April 18 and 19 were her regularly scheduled days off, and that she was out thereafter for medical reasons. Snow claims that only April 18 was a day off for Engblom, and that her absence between April 19 and May 3 was an "unauthorized leave." A copy of a list of absent correction officers apparently marked up by a member of the Mid-Orange staff, attached to plaintiffs' memorandum of law as Exhibit C, tends to support Engblom. Engblom's name is circled as "questionable," and the notation "extended sick leave" is penciled in beside it. Palmer was on the April 18–19 midnight-8:00 a. m. shift, and

apparently abandoned his post without relief, left the facility at 7:25 that morning, and remained on "unauthorized leave" through May 3. These details and discrepancies are not crucial in the court's view of the case.

6. Plaintiffs maintain, by affidavit, that neither of them used telephones at staff housing to persuade other correction officers to join the strike, or to threaten or intimidate them. They maintain further that there were "no serious acts of vandalism directed against correctional officers who continued to work . . .", and that there were "[no] serious acts of vandalism [at staff housing] except those perpetrated by defendants. . . ."

7. Snow asserts, by affidavit, that:

When the strike first began and up until the afternoon of April 20, 1979, no effort had been made to prevent the striking officers from entering the grounds or using the housing.

However, I learned that strikers had been using the in-house telephone system from telephones in the Upper and Lower staff housing to contact working correction officers and supervisors for the purposes of attempting to get these people to leave their post. There was a number of acts of vandalism to employees' cars as well as facility equipment, including the digging up and cutting of a TV cable on the facility grounds.

Plaintiffs assert that they were barred from the facility starting on April 19. Again, the precise timing here is not crucial.

the arsenal where their personal weapons were stored.

The Guard, executing "Operation Gold Plum" under the command of Captain Drew, arrived at Mid-Orange on April 19–20, and thereafter. The force reached a maximum of approximately 260 men during the strike. They were initially housed on floors of various rooms in the facility school and administration buildings. There were discussions between National Guard and prison officers about these housing arrangements.

On April 20 Engblom was granted permission to enter her room for a few minutes to retrieve some personal effects. At some time before April 25 the decision was made by Snow to order possessions cleared from the rooms of the absent correction officers, and simultaneously, or shortly thereafter, following consultation with the office of Hongisto in Albany, it was determined that National Guardsmen could occupy the vacated rooms. On April 25 the striking correction officers, including plaintiffs, were allowed into the staff buildings to remove their belongings. Plaintiffs at that time packed their belongings and placed them in a locked storage area in the building. Both claim that their personal effects had been noticeably disturbed, and some things taken, during their absence. Snow asserts that the belongings of officers who did not report to pack their own material were subsequently packed by inmates supervised one on one by Department personnel.

Plaintiffs urge that the striking resident correction officers were ordered to clear out their rooms specifically to provide quarters for the Guard, and this contention is supported by the deposition testimony of Deputy Superintendent Thomas K. Andrews and of defendant Drew.

The National Guardsmen occupied vacant rooms in the staff buildings on April 28. On that same day plaintiffs entered the facility with permission to retrieve belongings stored by them three days earlier. Again, there is the claim that storage cabinets had been broken into and items removed in the interim, allegedly by the members of the Guard. Plaintiffs claim that from on or about April 25 to May 5, their apartments were used without their consent to quarter soldiers of the Guard, and that despite requests, they continued to be denied access to their mail and weapons through most or all of this period.

Snow states that no troops were quartered in the staff housing buildings until after all personal belongings had been packed and removed from rooms, and that payroll deductions for staff housing rental were cancelled effective April 19. He states further that Engblom's personal property was never packed nor was her room used. He explains that "packing operations were discontinued at upper staff housing because there were females, both correction officers and civilians, who had rooms [there] and we did not want the inmates in the females' rooms." Snow asserts that weapons were not specifically ordered withheld, and that several of the striking employees withdrew theirs from the arsenal upon leaving the facility after the strike started. On April 22 the Department did revoke the striking officers' authority to carry firearms by virtue of their peace officer status. In the general confusion of the first days of the strike no arrangement was made for the absent personnel to pick up their mail, which normally was sorted into personal boxes at the facility administration building. On April 25, an agreement was reached among prison, union and Warwick post office officials whereby the absent correction officers' mail was returned to and held at the post office, and was available for pick-up, according to Snow, beginning on May 1.

Plaintiffs and other absent correction officers returned to work on May 5, not having been discharged. The Guardsmen left the facility that day. Both Engblom and Palmer still are employed as correction officers at Mid-Orange, but apparently neither now lives at staff housing.

Summary judgment is appropriate when, resolving all factual disputes and drawing all reasonable inferences in favor of the non-moving party, there is no genuine issue

of material fact and the moving party is entitled to judgment as a matter of law. *S.E.C. v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978); Fed.R.Civ.P. 56(c). "While constitutional issues should not be decided on an incomplete factual basis, 'summary judgment may be rendered ... where the record is adequate for the constitutional question presented and there is no genuine issue of material fact.'" *Keeler v. Joy*, 641 F.2d 1044, at 1047 (2d Cir. 1981) (Tenney, J. concurring), *quoting* 6 Moore's Federal Practice ¶ 56.17 [10] at 56–772 to –776 (2d ed. 1976). I conclude—even assuming, as is claimed, that troops actually were quartered in rooms previously occupied by both plaintiffs—that the record here contains the necessary facts established by pretrial discovery to resolve the primary questions presented.

The complaint alleges causes of action specifically under the Third Amendment, the "privacy" and "security" guarantees emanating from the First, Third, Fourth, Fifth and Ninth Amendments, and the due process and equal protection clauses of the Fourteenth Amendment with respect to the eviction of the plaintiffs and the quartering of troops; under the Second and Fourteenth Amendments with respect to the withholding of weapons; and under various constitutional and unspecified statutory provisions with respect to the withholding of mail. Finally, there are claims based apparently in the Fourth, Fifth and Fourteenth Amendments, relating to the alleged destruction and taking of property in the rooms, and the opening of and taking of property from locked storage cabinets. Those claims pertaining to the eviction and quartering—the Third Amendment and due process claims—fail because of the absence of the requisite property or possessory interest in the premises.[8] The mail claim will be dismissed as well as a matter of law. The remaining claims, not addressed in defendants' motion, survive.

Not surprisingly, there is little illumination recorded on the Third Amendment, from the debates of the Constitutional Convention to the present. It has, happily, been almost exclusively of historical interest. Justice Story, in his classic treatise on the Constitution, devoted only the following short paragraph to it:

This provision speaks for itself. Its plain object is to secure the perfect enjoyment of that great right of the common law, that a man's house shall be his own castle, privileged against all civil and military intrusion. The billetting of soldiers in time of peace upon the people has been a common resort of arbitrary princes, and is full of inconvenience and peril ....

J. Story, Commentaries on the Constitution § 1003 at 709 (1833). *See also* E. Corwin & J. Peltason, Understanding the Constitution 125 (3d ed. 1967); Lewis, *Whatever Happened to the 3rd Amendment?*, N.Y.L.J. Feb. 26, 1979, at 1 col. 1.

Heretofore there has been, as far as the court is aware, no cause for literal invocation of the Third Amendment, although it has been raised metaphorically from time to time,[9] and has figured, more significantly,

---

8. The complaint includes an equal protection claim, but it is not specifically pressed. In any event, the decision to bar from the grounds those not reporting to work had the requisite relation to the end sought—the maintenance of order at the struck facility—to withstand such a challenge. *Cf. Bynes v. Toll*, 512 F.2d 252, 254–55 (2d Cir. 1975).

To the extent that plaintiffs raise a Fourth Amendment claim with respect to the "seizure" of the premises, *see Marshall v. Barlow's Inc.*, 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978); *Camara v. Municipal Court*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967); *Laprease v. Raymours Furniture Co.*, 315 F.Supp. 716, 721–22 (N.D.N.Y.1970); *but see Wyman v.*

*James*, 400 U.S. 309, 91 S.Ct. 381, 27 L.Ed.2d 408 (1971), it fails for lack of the requisite reasonable expectation of privacy. *See infra*, pp. 67–68. Given my conclusions on the primary claims, a vague unsupported claim that penumbrae of privacy protect plaintiffs from intrusion on the premises fails as well.

9. Such invocation of the Third Amendment has been creative, if a bit wide of the mark. In *United States v. Valenzuela*, 95 F.Supp. 363, 366 (S.D.Cal.1951), the court found to be without merit the contention that:

'The 1947 House and Rent Act as amended and extended is and always was the incubator and hatchery of swarms of bureaucrats to be quartered as storm troopers upon the peo-

in discussions of the intent of the Framers of the Constitution, and of the spirit of that document, with respect to individuals' rights of privacy and the primacy of civilian authority.[10] However, the complaint here seeks to apply the prohibition of the Third Amendment directly to invalidate the alleged eviction and to protect plaintiffs' property interest.

To reach this issue, a few preliminary determinations are required. First, the Guard is the modern day successor to the Militia reserved to the states by Art. I, § 8, cls. 15, 16 of the Constitution, and members of that organization must be considered "soldiers." Further, National Guardsmen are, except when "federalized" by unit, *see* 10 U.S.C. §§ 331, 332, 672 (1970), employees of the State under the control of the Governor. *Maryland ex rel. Levin v. United States*, 381 U.S. 41, 46–47, 85 S.Ct. 1293, 1296–1297, 14 L.Ed.2d 205, *vacated on other grounds*, 382 U.S. 159, 86 S.Ct. 305, 15 L.Ed.2d 227 (1965); *Mela v. Callaway*, 378 F.Supp. 25, 28 (S.D.N.Y.1974) ("The National Guard, while something of a hybrid under both state and federal control, is basically a state organization. It serves the state in time of civil emergencies within the state as well as being available for federal service during national emergencies.") Therefore 42 U.S.C. § 1983, prohibiting deprivation of individuals' rights under color of state law, properly is invoked against all defendants.

The court is presented also with the question of whether the Third Amendment is incorporated into the Fourteenth for application to the actions of state organizations, officials, and employees. Here it should not be necessary to wander too far into the thicket of incorporation jurisprudence. Under any of the theories extant, perhaps most likely as a right "so rooted in the tradition and conscience of our people as to be ranked as fundamental" and thus "implicit in the concept of ordered liberty," *see Griswold v. Connecticut*, 381 U.S. 479, 499, 85 S.Ct. 1678, 1689, 14 L.Ed.2d 510 (1965) (Harlan, J. concurring); *Palko v. Connecticut*, 302 U.S. 319, 325, 58 S.Ct. 149, 151, 82 L.Ed. 288 (1937) (Cardozo, J.); 1 B. Schwartz, A Commentary on the Constitution of the United States 172 (1968); *see also Griswold, supra*, 381 U.S. at 482–86, 85 S.Ct. at 1680–1682 (Douglas, J.), and 487–88, 85 S.Ct. at 1683 (Goldberg, J. concurring); *Adamson v. California*, 332 U.S. 46, 59–68, 67 S.Ct. 1672, 1679–1683, 91 L.Ed. 1903 (Frankfurter, J. concurring) and 68–72, 67 S.Ct. at 1684–1686 (Black, J. dissenting); L. Tribe, American Constitutional Law, § 11–2, –3 at 567–72 (1978), the right not to have troops quartered in one's home must be considered so incorporated.

We do not have the benefit of case law in parsing the language of the Amendment "in any house, without the consent of the Owner." Of course, the literal owner of the houses in question was the State, which directed the quartering. While perhaps a narrow view of the constitutional language might suffice, we turn to the cases dealing with kindred liberty and privacy interests protected in other Bill of Rights provisions.

---

ple in violation of Amendment III of the United States Constitution.'
*See also Securities Investor Protection Corp. v. Executive Securities Corp.*, 433 F.Supp. 470, 473 n.2 (S.D.N.Y.1977).

**10.** Justice Douglas, in dissent in *Poe v. Ullman*, 367 U.S. 497, 522, 81 S.Ct. 1752, 1765, 6 L.Ed.2d 989 (1961), wrote:

> Can there be any doubt that a Bill of Rights that in time of peace bars soldiers from being quartered in a home 'without the consent of the Owner' should also bar the police from investigating the intimacies of the marriage relation? [footnote omitted].

This position of Justice Douglas foreshadowed the majority opinion in *Griswold v. Connecti-*

*cut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1968) (Douglas, J.), wherein the court held that emanations from certain Bill of Rights provisions including the Third Amendment form penumbrae of privacy which protect the right of married couples to use contraceptives. *See also Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 644, 72 S.Ct. 863, 874, 96 L.Ed. 1153 (1952) (Jackson, J. concurring); *Dorman v. United States*, 435 F.2d 385, 403 at n.7 (D.C.Cir.1970) (en banc) (Wright, J. concurring in part and dissenting in part); *Franceschina v. Morgan*, 346 F.Supp. 833, 839 (S.D.Ind. 1972); *People v. Doorley*, 338 F.Supp. 574 (D.R.I.), *reversed on other grounds*, 468 F.2d 1143 (1st Cir. 1972).

Judicial analysis of the scope of Fourth Amendment protection is helpful in this respect. The language "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" extends protection to an apartment dweller or hotel guest, and even one who borrows a friend's apartment or car, or occupies a public phone booth. *See Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); *United States v. Agapito*, 620 F.2d 324, 333–35 (2d Cir. 1980); *cert. denied*, 449 U.S. 834, 101 S.Ct. 107, 66 L.Ed.2d 40 (1980); *United States v. Ochs*, 595 F.2d 1247, 1252–53 (2d Cir.) *cert. denied*, 444 U.S. 955, 100 S.Ct. 435, 62 L.Ed.2d 328 (1979); *United States v. Bell*, 488 F.Supp. 371 (D.D.C.1980). Under the Fourth Amendment the proper inquiry is whether the person claiming protection has a legitimate expectation of privacy—usually arising from a property or possessory interest—in the premises searched or an interest in the thing seized. *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). Another useful analogy is to the line of decisions deriving from *Marsh v. Alabama*, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946), proscribing interference by the owner with certain First Amendment liberties of occupants of "company towns" (particularly migrant or farm camps) and their visitors. *See e. g. Mid-Hudson Legal Services, Inc. v. G & U, Inc.*, 437 F.Supp. 60 (S.D.N.Y.1977); *Franceschina v. Morgan*, 346 F.Supp. 833 (S.D.Ind.1972). Indeed, the *Franceschina* court went so far as to state:

> [T]he company has voluntarily elected to furnish temporary homes to migrants as an aid to its business. It can no more deny access to those homes to persons going to offer sorely needed assistance to the migrants, than it can enter them, search them, or quarter troops in them during the period of their lawful occupancy [footnote omitted].

*Id.* at 839. The court reasoned that the "controlling status" is not the precise nature of the employees' occupancy—be it tenancy, license or otherwise—but "that

[they] are citizens of the United States, residing in their own homes, and are entitled to be treated as such." *Id.* at 838. *But cf. United States v. Buettner-Janusch*, 646 F.2d 759 (2d Cir. 1981) (third party with access to area searched, and either common authority over it, a substantial interest in it, or express or implied permission to exercise that access has power to permit governmental intrusion into the area, even though defendant reasonably regards it as private).

In short, in light of years of related jurisprudence, reason would dictate that the words "house" and "owner," in constitutional terms, extend the protection of the Third Amendment beyond a fee simple interest in a traditional place of abode. However, it does not follow that this protection encompasses the entire range of possessory interests in a premises or dwelling short of that of the "casual visitor" legitimately on the premises covered under the Fourth Amendment.

Plaintiffs argue that their interest in the property was a tenancy, which involves, under New York law, "an interest in real property which passes to the tenant, and a possession exclusive even of that of the landlord, except as the lease permits the landlord's entry and saving always his right to enter to demand rent or to make repairs." *The Statement, Inc. v. Pilgrim's Landing, Inc.*, 49 A.D.2d 28, 370 N.Y.S.2d 970, 975 (4th Dept. 1975), *quoting Layton v. A.I. Namm & Sons, Inc.*, 275 A.D. 246, 89 N.Y.S.2d 72, 74 (1st Dep't. 1949), *aff'd*, 302 N.Y. 720, 98 N.E.2d 590 (1951). A lease is "the transfer of absolute control and possession of property at an agreed rental." *Id., quoting Feder v. Caliguira*, 8 N.Y.2d 400, 404, 208 N.Y.S.2d 970, 972, 171 N.E.2d 316 (1960). Since plaintiffs were tenants under leases at staff housing, the argument goes, their property interest was considerable and they were entitled to substantial hearing rights under the New York Real Property Law ("R.P.L.") and the Real Property Actions and Proceedings Law ("R.P.A.P.L.") before they could lawfully be evicted or ejected.

There are some aspects of the residency relationship between plaintiffs and the Department which might be consistent with tenancy. The $36 monthly payroll deductions are a sort of rent. Possession of assigned rooms for all practical purposes seemed exclusive. Room furnishings apparently are largely provided by the occupants. *Cf. Chawla v. Horch*, 70 Misc.2d 290, 333 N.Y.S.2d 531, 533 (N.Y.Civ.Ct.1972). Item 6 of the Department Directive speaks of repairs and rehabilitation being performed "in keeping with normal 'landlord-tenant' responsibilities and practices," and refers in other places to staff housing occupants as "tenants." *See* note 4 at II D 6, 7 & 8. The Directive and the Rules speak in terms of notice and investigation or hearing before housing privileges may be rescinded for "conduct detrimental to the facility," a violation of the regulations, or like reasons. *See id.*, II C 3; note 3, at VIII and K. Moreover, it is true that a document signed by owner and resident pertaining to occupancy of a premises may, depending on the end sought by the instrument and the practice of the parties, be found to be a lease even though it is entitled otherwise. *E. g. Miller v. City of New York*, 15 N.Y.2d 34, 255 N.Y.S.2d 78, 80, 203 N.E.2d 478 (1964); *Arol Development Corp. v. Goodie Brand Packing Corp.*, 84 Misc.2d 493, 378 N.Y.S.2d 231 (1st Dept. 1975); *Statement Inc. v. Pilgrim's Landing, supra*, 370 N.Y.S.2d at 974.'

I conclude, however, that plaintiffs' occupancy was most analogous to possession incident to employment, which carries with it a somewhat lesser bundle of rights than does a tenancy. *See Dobson Factors, Inc. v. Dattory*, 80 Misc.2d 1054, 364 N.Y.S.2d 723 (N.Y.Co.Civ.Ct.1975); *Hartman v. Sykes*, 66 Misc.2d 764, 322 N.Y.S.2d 158 (N.Y.Co.Civ. Ct.1971); *Mayer v. Norton*, 62 Misc.2d 887, 310 N.Y.S.2d 576 (N.Y.Co.Civ.Ct.1970); 1 J. Rasch, New York Landlord & Tenant §§ 68, 69 at 91–94 (2d ed. 1971). *Compare Walton v. Darby Town Houses, Inc.*, 395 F.Supp.

553, 557–59 (E.D.Pa.1975). While occupancy of the premises was not a job requirement in this instance, the provision of prison housing to plaintiffs and others was obviously and directly connected to their services rendered—motivated by the desire to have certain personnel close at hand at all times.[11] Plaintiffs' occupancy at staff housing began subsequent to their employment as correction officers. There is no suggestion that it could have been otherwise, or that such occupancy could continue after the termination of employment. This housing was provided solely for prison personnel. Under the circumstances, the document which plaintiffs claim constitutes a lease does not reflect such an intention or practice of the parties. *See Lahti v. State*, 98 Misc.2d 829, 414 N.Y.S.2d 607, 609 (N.Y. Ct.Cl.1979); *see also* Rasch, *supra*. *Cf. Hines v. Seaman*, 305 F.Supp. 564 (D.Mass. 1969).

Indeed, in several respects plaintiffs' occupancy bespeaks a lesser relationship than that entered into even by the typical building superintendent who receives an apartment as an incident of his work. The Rules placed several restrictions on plaintiffs' asserted "exclusive possession" of the premises, including a family only, no guest policy which would not be included in the normal arrangement between employer and employee, let alone in an ordinary lease. Further, the administration retained a master key to all staff rooms, as well as the right to inspect the premises at any time. *See* note 3, at A. Stated grounds for eviction were broad and vague. An addendum to the Rules added absence from work as a "basis for removal." Perhaps the most important consideration is the context—dormitory-type staff housing on the grounds of a state prison. I conclude, despite the dictum of the *Franceschina* court, *supra*, which might suggest the contrary, that plaintiffs' possessory interest in the premises did not entitle them to Third Amendment protec-

---

**11.** There is an apparent contradiction between a statement in the Directive, dated March 26, 1975, ("The Department will no longer issue a certification that housing is for the benefit of the employer"), see note 4, at II D 4, dealing primarily with tax treatment, and the Addendum to the Rules and Regulations dated June 13, 1978, which states: "Housing on facility grounds is granted for the benefit of the facility." *See* note 2.

tion particularly since the State, the only "owner" of the "house" in question here, consented to the quartering.

The remaining constitutional protection due plaintiffs also depends substantially on the nature of their possessory interest in the premises. *Cf. Rakas v. Illinois, supra*, 439 U.S. at 143 & n.12, 99 S.Ct. at 430. Thus, it is asserted, plaintiffs were entitled at least to the notice and hearing rights of a summary proceeding, R.P.A.P.L. §§ 711, 731–41, before being evicted. They got only point blank notice, and no hearing. Plaintiffs press, in the alternative, that even if their occupancy is characterized more accurately as a tenancy at will, month to month, hold over, license or occupancy incident to employment, their possessory interest still would render unconstitutional the summary actions taken by defendants. They point out that they still would be entitled to certain process under R.P.A.P.L., Article 7. Specifically, with respect to the last category, occupancy incident to employment, the relevant R.P.A.P.L. provision is § 713(11), which applies upon the agreed expiration of possession, or termination of employment. Here, plaintiffs and others similarly situated were not terminated. As for notice of eviction, they were simply told on the picket line that they were being locked out effective immediately, were instructed a few days later to enter and remove their belongings, and, assertedly, then were replaced by National Guardsmen.

■ I have already stated my conclusion that no Third Amendment violation occurred. I conclude further that if there was a property deprivation in these "evictions," it was a violation of state law and was not of constitutional dimensions. The substantive or procedural rights accorded plaintiffs in the Directive and Rules are vague and contradictory. If plaintiffs' interest is categorized as something resembling occupancy incident to employment, they would have certain rights under the New York real property laws. These protections would be largely procedural, violation of which is not encompassed by the Due Process Clause of the Fourteenth Amendment. *See Cofone v. Manson*, 594 F.2d 934, 937–38 (2d Cir. 1979); *Lake Michigan College Fed. of Teachers v. Lake Michigan Comm. College*, 518 F.2d 1091, 1095–96 (7th Cir. 1975), *cert. denied*, 427 U.S. 904, 96 S.Ct. 3189, 49 L.Ed.2d 1197 (1976); *Bonin v. Gannon*, 494 F.Supp. 78, 83 (M.D.Pa.1980); *Maloney v. Sheehan*, 453 F.Supp. 1131, 1140–41 (D.Conn.1978). Further, to the extent that plaintiffs possessed substantive rights under state law and Department of Corrections practice, the property interest thereby created—and the injury sustained in this context—were not such as to establish a constitutional deprivation here. *Cf. Paul v. Davis*, 424 U.S. 693, 699–701, 96 S.Ct. 1155, 1159–1160, 47 L.Ed.2d 405 (1976); *O'Grady v. City of Montpelier*, 573 F.2d 747, 751 (2d Cir. 1978); *KAO v. Red Lion Municipal Authority*, 381 F.Supp. 1163 (M.D.Pa.1974).

These, after all, were not tenants in ordinary apartments, or anything of the sort. *Compare Keeler v. Joy, supra*, at 1050–1051; *Caramico v. Secretary of H. U. D.*, 509 F.2d 694, 700–01 (2d Cir. 1974); *Gramercy Spire Tenants' Assoc. v. Harris*, 446 F.Supp. 814, 823–24 (S.D.N.Y.1977). Rather, they were employees of a very specialized institution who, in applying for and accepting on-grounds housing, must be charged with knowledge of the risks and the possible limitations on their "rights" involved. *Cf. Bynes v. Toll*, 512 F.2d 252, 254–55 (2d Cir. 1975); *Biehunik v. Felicetta*, 441 F.2d 228 (2d Cir.), *cert. denied*, 403 U.S. 932, 91 S.Ct. 2256, 29 L.Ed.2d 711 (1971). Even if a property right for the purposes of due process analysis may sometimes be found independently in federal constitutional law, *see Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 447–48 (2d Cir. 1980), there is no ground for such a finding in the situation presented herein. There has been nothing like a showing of legitimate expectation based on mutual understanding concerning control of staff housing under such circumstances, *see Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); indeed, reason would dictate to the contrary. It bears repeating here that plaintiffs paid no rent for the period of the strike and the "lock-out."

Further, I hold that at the time plaintiffs were barred from the premises, told to remove their belongings, and replaced by National Guardsmen, they were not deprived of a property right but voluntarily relinquished whatever rights they did possess. In essence, they were not illegally evicted, but rather, by participating in the strike, discontinued their employment incident to which that housing was provided, at least for the duration of the strike. Engblom claims that the strike happened to coincide with her two regularly scheduled days off commencing April 18, and a medical absence thereafter. This may well be so. *See* note 5. However, as she took active part in strike activities, it would appear that she too voluntarily relinquished her rights in the premises and so was properly excluded from the facility under the circumstances.[12] Of course, if in fact her absence beyond the first days was also unexcused, she is in the same position as Palmer.

Were plaintiffs found to have had some possessory or other constitutionally protected interest in the premises and to have retained that interest during the strike contrary to the conclusions just stated, however, the court would then confront the common law doctrine of necessity—in this case public necessity—with respect to the State's summary "taking" in the public interest to lessen the real danger of disorder at Mid-Orange. Restatement (Second) of Torts §§ 196, 262 and reporter's notes thereto; W. Prosser, The Law of Torts § 24 (3d ed. 1971). *Cf. United States v. Caltex, Inc.,* 344 U.S. 149, 154–55, 73 S.Ct. 200, 202–203, 96 L.Ed. 1355 (1952); *Russell v. The Mayor of the City of New York,* 2 Denio, N.Y. 461, 473–77 (1845) (Sherman, Senator); *Stocking v. Johnson Flying Service,* 143 Mont. 61, 387 P.2d 312, 316–17 (1963); *Holbert v. Harrigan,* 187 Misc. 858, 66 N.Y.S.2d 246, 249–50 (Mun.Ct.Syrac.1946). *Compare Hicks v. Dorn,* 42 N.Y. 47, 53–54 (1870). All the more strong would be the case for application of this doctrine given plaintiffs' own active participation in the events threatening public danger, *see* Prosser, *supra,* at 127, and the setting therefor. A careful analysis of the federal jurisprudence pertaining to summary action by the government with respect to persons and property in time of national or local emergency would then be required. *See United States v. Caltex, Inc., supra; Youngstown Sheet & Tube Co. v. Sawyer, supra; Korematsu v. United States,* 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944); *Sterling v. Constantin,* 287 U.S. 378, 53 S.Ct. 190, 77 L.Ed. 375 (1932); *Moyer v. Peabody,* 212 U.S. 78, 29 S.Ct. 235, 53 L.Ed. 410 (1909). *Cf. Warden, Maryland Penitentiary v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); *Joint Anti-Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 162, 71 S.Ct. 624, 643, 95 L.Ed. 817 (1951) (Frankfurther, J., concurring); *Ewing v. Mytinger & Casselberry,* 339 U.S. 594, 599–600, 70 S.Ct. 870, 872–873, 94 L.Ed. 1088 (1950); *North American Cold Storage Co. v. City of Chicago,* 211 U.S. 306, 29 S.Ct. 101, 53 L.Ed. 195

---

**12.** The court is aware that Civil Service Law § 210 itself provides for certain penalties which may be imposed against those who strike in violation thereof, according to the procedures provided therein. *See DeLury v. Beame,* 49 N.Y.2d 155, 424 N.Y.S.2d 393, 395, 400 N.E.2d 333 (1979); *Sanford v. Rockefeller,* 35 N.Y.2d 547, 364 N.Y.S.2d 450, 324 N.E.2d 113 (1974), *appeal dismissed,* 421 U.S. 973, 95 S.Ct. 1972, 44 L.Ed.2d 465 (1975); *Tepper v. Galloway,* 481 F.Supp. 1211 (E.D.N.Y.1979); *see also Cheeseman v. Carey,* 623 F.2d 1387 (2d Cir. 1980). The Taylor Law prohibition against strikes by public employees, it should be noted, has been declared constitutional. *E. g. City of New York v. DeLury,* 23 N.Y.2d 175, 295 N.Y.S.2d 901, 243 N.E.2d 128 (1968), *appeal dismissed,* 394

U.S. 455, 89 S.Ct. 1223, 22 L.Ed.2d 414 (1969). *Cf. United Federation of Postal Clerks v. Blount,* 325 F.Supp. 879 (D.D.C.), *aff'd. mem.,* 404 U.S. 802, 92 S.Ct. 80, 30 L.Ed.2d 38 (1971). Given that, and the circumstances herein, the general prohibition against deprivation of an interest such as government employment as punishment for the exercise of a constitutionally protected right, *see Mt. Healthy City Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), would apparently not be offended by defendants' treatment of either plaintiff. *Cf. Snepp v. United States,* 444 U.S. 507, 509 n.3, 100 S.Ct. 763, 765, 62 L.Ed.2d 704 (1980).

(1908).[13] In addition, consideration of the wide latitude accorded correctional authorities in the governance of these facilities, both to set rules and regulations and to take day to day measures in the interest of safety and security, would be required.[14] In view of the conclusions already reached this difficult undertaking will be eschewed.

■ There are no material facts in dispute with respect to the withholding of mail claim. As the delay or "interference" was unrelated to the government's censorship of or interest in the content of the mail, no First Amendment violation is apparent in this setting. *Compare Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); *Blount v. Rizzi*, 400 U.S. 410, 91 S.Ct. 423, 27 L.Ed.2d 498 (1971); *Lamont v. Postmaster General*, 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965). In any event, I conclude that no constitutional provision was offended by this delay in the delivery of the mail. Under the circumstances, the delay and the resolution of the problem were not unreasonable, and no wrong of constitutional dimensions occurred. *Cf. Contemporary Mission, Inc. v. United States Postal Service*, 648 F.2d 97, at 106 (2d Cir. 1981); *Owen v. Shuler*, 466 F.Supp. 5 (N.D.Ind.1977); *aff'd. mem.*, 594 F.2d 867 (7th Cir. 1979). Plaintiffs do not specify a statute supporting this claim, and the court has found none.

It may well be that no factual dispute exists as to the weapons claim and the claims concerning the opening of the locked storage cabinets and the damage to and taking of personal property. However, in the context of this unusual case, the positions of the parties with respect to these allegations are not altogether clear. Therefore, the disposition of these claims will be discussed at a conference of this court on May 26, 1981 at 4:45 p. m. In accordance with the foregoing, all other claims are hereby dismissed.

IT IS SO ORDERED.

## ON SUMMARY JUDGMENT MOTION ON SUBSIDIARY CLAIMS

By opinion of May 19, 1981, this court granted defendants' motion for partial summary judgment addressed to plaintiffs' original constitutional attack on their eviction from on-grounds housing at Mid-Orange Correctional Facility during a statewide strike of correction officers in April-May, 1979, and the quartering of National Guardsmen, called out by Governor Carey to provide security at Mid-Orange and other facilities during the strike, in the rooms thus made vacant. Familiarity with that opinion, including its detailed statement of the facts of this case, is assumed. Presently before the court is defendants' motion for summary judgment on the subsidiary claims of damage to and interference with personal property which, I concluded previously, had not been sufficiently developed or opposed to permit of resolution. Upon the record as now supplemented by the parties' submissions and oral argument on this motion, I find that there is no genuine

---

**13.** Here, of course, no process preceded or followed what plaintiffs claim was the deprivation of their property. Were the court to agree that there was such a deprivation, it would appear that the above-cited cases would have to be analyzed together with those discussing what process is due in various circumstances. *See Mathews v. Eldridge*, 424 U.S. 319, 334–35, 96 S.Ct. 893, 902–903, 47 L.Ed.2d 18 (1976); *Fuentes v. Shevin*, 407 U.S. 67, 86–92, 92 S.Ct. 1983, 1997–2000, 32 L.Ed.2d 556 (1972); *Carrion v. Yeshiva University*, 535 F.2d 722, 730 (2d Cir. 1976); *Eagle v. Koch*, 471 F.Supp. 175, 178 (S.D.N.Y.1979).

**14.** *See Bell v. Wolfish*, 441 U.S. 520, 546–47, 99 S.Ct. 1861, 1877–1878, 60 L.Ed.2d 447 (1979); *Wolff v. McDonnell*, 418 U.S. 539, 562, 94 S.Ct. 2963, 2977, 41 L.Ed.2d 935 (1973); *Pugliese v. Nelson*, 617 F.2d 916, 925 (2d Cir. 1980); *Baker v. Wilmot*, 65 A.D.2d 884, 410 N.Y.S.2d 184, 185 (3d Dept. 1978). This latitude extends not only to persons who have surrendered some rights of citizenship by virtue of their criminal arrests or convictions; but to the lives of the non-prisoners legitimately affected. *Cf. Curle v. Ward*, 59 A.D.2d 286, 399 N.Y.S.2d 308, 311, and 312–14 (Kane J. dissenting) (3rd Dept. 1977), *modified*, 46 N.Y.2d 1049, 416 N.Y.S.2d 549, 389 N.E.2d 1070 (1979).

The events of two years ago at Santa Fe are only one recent reminder of the pressures existing in America's prisons. *See e. g.* Lieber, *The American Prison: A Tinder Box*, The New York Times Magazine, March 8, 1981 at 26.

issue of material fact on the remaining property claims, and that defendants are entitled to judgment thereon as a matter of law. *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978). Therefore the motion will be granted and the action dismissed.

It is claimed that by virtue of their being barred from the facility during the strike, plaintiffs were during that period denied access to their personal weapons, which normally were stored at the facility arsenal when their owners were on the grounds or did not retrieve them upon leaving. This, it is claimed, constitutes an infringement of plaintiffs' right to bear arms under the Second Amendment. Defendants do not deny that firearms belonging to plaintiffs remained in the arsenal during the two-week strike. They do contend, without opposition, that the weapons were never specifically ordered withheld, and that plaintiffs could have, according to normal procedure, retrieved their weapons upon leaving the facility when or before the strike started, as did others.

■ While the facts surrounding the weapons claim, including the ramifications of the apparent revocation by the Department of Corrections, three days into the strike, of the striking officers' authority to carry firearms by virtue of their peace officer status, still are not fully developed, it is clear as a matter of law that no Second Amendment violation occurred.

> This provision of the Constitution reads: A well regulated Militia, being necessary to the security of a free State, the right of people to keep and bear Arms, shall not be infringed.

Whatever the scope of an *individual's* right to keep and bear arms thereby recognized, *see United States v. Tot*, 131 F.2d 261 (3d Cir. 1942), *rev'd on other grounds*, 319 U.S. 463, 63 S.Ct. 1241, 87 L.Ed. 504 (1943); *In re Atkinson*, 291 N.W.2d 396, 398 n.1 (Sup. Ct.Minn.1980), it is well established that regulation or infringement of that right does not violate the Second Amendment unless the activity infringed "has some reasonable relationship to the preservation or efficiency of a well regulated militia...." *United States v. Miller*, 307 U.S. 174, 178, 59 S.Ct. 816, 818, 83 L.Ed. 1206 (1939). Whether or not plaintiffs' possession of these weapons meets that criterion, the equally well established "conclusive answer" to this claim is that the Second Amendment is addressed exclusively to infringing action by the federal government. There is unanimity in the authorities that such a claim cannot be brought against a state, or its agencies, subdivisions, or officials. *Presser v. Illinois*, 116 U.S. 252, 265, 6 S.Ct. 580, 584, 29 L.Ed. 615 (1886); *Eckert v. City of Philadelphia*, 329 F.Supp. 845 (E.D.Pa.1971), *aff'd*, 477 F.2d 610 (3d Cir. 1972), *cert. denied*, 414 U.S. 839, 94 S.Ct. 89, 38 L.Ed.2d 74 (1973); *see also State v. Sanne*, 116 N.H. 583, 364 A.2d 630 (1976); *Burton v. Sills*, 53 N.J. 86, 248 A.2d 521, 525–28 (1968), *appeal dismissed*, 394 U.S. 812, 89 S.Ct. 1486, 22 L.Ed.2d 748 (1969); L. Tribe, American Constitutional Law, § 5–1 at 226 n.6 (1978). Plaintiffs' failure to press seriously this claim beyond their complaint perhaps indicates their realization of its basic infirmity.

What remains is the claim that personal property of plaintiffs' was damaged, destroyed or otherwise interfered with by defendants—unnamed members of the National Guard, Mid-Orange contingent—constituting deprivation of property without due process of law in violation of the Fourteenth Amendment. Although it appeared previously that plaintiffs were seeking relief under the Fourth Amendment for the alleged forced opening of their locked storage cabinets and destruction of property contained therein (see opinion of May 19, slip op. at 4, 6, 16) only the general damage and destruction of personal property discovered by plaintiffs on April 25, 1979 in the rooms they had occupied is pressed. This damage to property was allegedly caused by unnamed members of the National Guard contingent.

■ On this record compiled after extensive discovery it appears that several if not all of the named defendants, supervisory personnel of various capacities, properly

could claim the benefit of the personal involvement prerequisite to liability in a § 1983 civil rights action such as this. *McKinnon v. Patterson*, 568 F.2d 930 (2d Cir. 1977), *cert. denied*, 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978); *see Monell v. Dep't of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Johnson v. Glick*, 481 F.2d 1028, 1033–34 (2d Cir.), *cert. denied*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973). Similarly, the qualified good faith immunity defense apparently would protect most of the defendants in the absence of anything more than bare allegation of bad motive or anything approaching such. *See Procunier v. Navarette*, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978); *McKinnon v. Patterson, supra*, 568 F.2d at 934–35. *But see Peterson v. Christensen*, 455 F.Supp. 1095, 1101 (E.D. Wisc.1978); *Marty's Adult World of New Britain, Inc. v. Guida*, 453 F.Supp. 810, 816 (D.Conn.1978). Such determinations are unnecessary however. For, as plaintiffs themselves recognize, the damage-to-property claim stands on extremely weak ground under *Parratt v. Taylor*, —— U.S. ——, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). Indeed, I conclude the record supports no other inference but that whatever injury occurred was the result of isolated, unauthorized conduct by agents of the State. As such, without having pursued a state remedy for this tortious loss, plaintiffs cannot be said to have suffered deprivation of property under color of state law *without due process of law. Id.* The reach of this doctrine beyond negligent damage to property is not certain. In any event, to the extent that plaintiffs seek to escape this rule by alleging wanton and intentional violation of their rights, these unsupported allegations of defendants' state of mind, after full discovery, do not survive this motion for summary judgment. *Cf. Markowitz v. Republic National Bank of New York*, 651 F.2d 825, at 827–828 (2d Cir. 1981).

For the foregoing reasons, the defendants' motion is granted and the action is hereby dismissed. Submit judgment on notice within ten (10) days.

IT IS SO ORDERED.