512 F.2d 252
 William and Denise BYNES, on behalf of themselves and their
infant child, Terrance Bynes, et al., Plaintiffs-Appellees,
v.
John S. TOLL, Individually and in his capacity as President
of the State University of New York at Stony Brook, and
Roger V. Phelps, Individually and in his capacity as
Director of Housing of the State University of New York at
Stony Brook, Defendants-Appellants.
 No. 544 Docket 74-2433.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 12, 1974.
Decided Feb. 6, 1975.
 
 Stephen Dobkin, Brooklyn, N. Y. (Brooklyn Legal Services, John C. Gray, Jr., Brooklyn, N. Y., Ellen Zweibel, New York City, on the brief), for plaintiffs-appellees.
 A. Seth Greenwald, Asst. Atty. Gen., New York City (Louis J. Lefkowitz, Atty. Gen. of N. Y., Samuel A. Hirshowitz, First Asst. Atty. Gen., of counsel), for defendants-appellants.
 Before FEINBERG and MULLIGAN, Circuit Judges, and BRYAN,* District Judge.
 MULLIGAN, Circuit Judge:
 
 
 1
 This appeal raises the question whether the State University of New York at Stony Brook is constitutionally required to allow married students with children to live in dormitory suites provided for married students without children.
 
 
 2
 The plaintiffs are married students at Stony Brook who instituted a civil rights action under 42 U.S.C. § 1983 on November 27, 1973 in the United States District Court, Eastern District of New York, challenging a University residency requirement, incorporated in all housing agreements between the University and the students, which bars children of students from living in married-student suites. The defendants are the President and the Director of Housing of the said University, respectively. The gravamen of the complaint is that the ban on children's residence on campus constitutes a denial of equal protection and a compulsory waiver of the parents' right of marital privacy and the right to raise their children as they see fit.[1]
 
 
 3
 On June 26, 1974 District Judge Orrin G. Judd denied plaintiffs' motion for a preliminary injunction and also denied the defendants' motion to dismiss. After a trial on the merits, Judge Judd in a memorandum of decision dated October 31, 1974 enjoined the defendants from enforcing against any of the plaintiffs the provisions of any residency agreement which would prohibit children from residing in married couples' suites in the University. On November 6, 1974 a panel of this court granted the defendants' motion for a stay pending appeal. On November 14, Judge Judd entered an order granting a permanent injunction and also granted the plaintiffs a priority in moving back into married students' suites. At this time all the named plaintiffs have moved to off-campus housing. Moreover, by reason of increased demand for this housing by single students, the University has announced that all on-campus married-student housing will be eliminated starting in September 1975. This would in effect render this appeal moot except that the plaintiffs have also sought money damages in the aggregate of $54,000. We therefore turn to the merits of the appeal.
 
 I. FACTS
 
 4
 The residence units at Stony Brook include suites, consisting of two or three bedrooms, a common living room, and a private bath with shower but no tub.[2] Though originally intended to accommodate single students of the same sex, some of the suites were made available on a temporary basis to married students in the fall of 1972, when the demand for them by single students declined.
 
 
 5
 Each residence building has basement laundry facilities. Many floors contain lounge areas, which, while not originally intended for use by children, were used by them in the past with no apparent interference to students.[3] Cooking is now permitted in dormitory rooms, on small appliances (e. g., hot plates) furnished by the students themselves. The University has promulgated regulations for cooking in rooms, in an attempt to minimize fire hazards, but there have still been 53 fires in dormitory rooms during the period January 1, 1973-June 30, 1974. The dormitories are fireproof and all suites are equipped with automatic fire alarms and extinguishers. Lastly, there is a day-care center on campus.
 
 
 6
 It is not disputed that children of the faculty and staff are permitted to live on campus; however they do not reside in student suites but in special apartments built as family quarters in the dormitories. Children of students may visit their parents on campus until 9 p. m. There is no evidence of complaints by other students to the presence of live-in children in the dormitories.
 
 
 7
 Off-campus housing is available for married students, though at a significant increase in rent over on-campus housing;[4] in addition, many off-campus housing facilities do not permit children at all.
 
 
 8
 All the plaintiffs concededly signed the University's form residence agreement, which incorporated the ban on children living in married-student housing. Threatened with eviction and other penalties for violation of the ban, plaintiffs were forced either to vacate their on-campus housing or to board their children off-campus. As a result they instituted this action in November 1973.
 
 II. CONSTITUTIONAL CONSIDERATIONS
 
 9
 We agree with the court below that the appropriate "test" to be applied to the constitutional claim involved here is the traditional "limited scrutiny" standard. In discussing this standard, Chief Justice Warren stated in McGowan v. Maryland, 366 U.S. 420, 425-26, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961) with respect to the equal protection clause:
 
 
 10
 The constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective.... A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it.
 
 
 11
 To the same effect is his opinion in McDonald v. Board of Election Comm'rs, 394 U.S. 802, 809, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1969).
 
 
 12
 Regardless of academic suggestions that the Supreme Court was in the process of adopting an intermediate equal protection test, which we have recently discussed in Noel v. Chapman, 508 F.2d 1023, 1028 (2d Cir. 1975), it seems clear that the traditional limited scrutiny test is applicable here. The most recent formulation of this test appears in Village of Belle Terre v. Boraas, 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974), which involved a village zoning regulation directed against the housing of unmarried people in single family dwellings. In that case the Court upheld the ordinance despite the claim that it violated equal protection rights. The Court held that the ordinance was "reasonable, not arbitrary" and that it bore " 'a rational relationship to a (permissible) state objective.' " 416 U.S. at 8, 94 S.Ct. at 1540 (citations omitted).
 
 
 13
 There is no claim that the classification here is made on any "suspect" basis. Moreover it is well established that the right to housing is not a fundamental interest which would require the more stringent "compelling state interest" test. Lindsey v. Normet, 405 U.S. 56, 73-74, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972). Appellants have urged that the right of marital privacy and the right to raise their children as they see fit somehow change the issue here. We cannot agree. The same argument might well be raised in every case where housing is denied or occupancy is sought beyond the terms of the lease. The Court in Lindsey v. Normet, supra, 405 U.S. at 74, 92 S.Ct. at 874, was explicit:
 
 
 14
 But the Constitution does not provide judicial remedies for every social and economic ill. We are unable to perceive in that document any constitutional guarantee of access to dwellings of a particular quality, or any recognition of the right of a tenant to occupy the real property of his landlord beyond the term of his lease without the payment of rent or otherwise contrary to the terms of the relevant agreement.
 
 
 15
 The relevant regulation here of course precluded occupancy by children of married students; each of the plaintiffs in this case signed agreements in which they pledged to abide by this and other University Housing Regulations and so must have recognized that their failure to abide by them subjected them to appropriate University sanctions.
 
 
 16
 The University here is not interfering with the marital privacy of the plaintiffs or their unquestioned natural right to bring up their children. They are totally free to procreate and educate their offspring-the only question is whether the University is constitutionally mandated to provide them campus housing to perform their protected prerogatives. A comparable argument was recently made by resident aliens who complained that the deportation of their spouses precluded their constitutional right to live together in marriage. This claim was rejected in Noel v. Chapman, supra, as it had been in Silverman v. Rogers, 437 F.2d 102 (1st Cir. 1970), cert. denied, 402 U.S. 983, 91 S.Ct. 1667, 29 L.Ed.2d 149 (1971), and Swartz v. Rogers, 103 U.S.App.D.C. 1, 254 F.2d 338, cert. denied, 357 U.S. 928, 78 S.Ct. 1373, 2 L.Ed.2d 1372 (1958). In Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970) the argument was made in dissent that a $250 maximum per family welfare grant, regardless of the size of the family or its computed need, would encourage families to live apart. Rejecting this position, the Court upheld the regulation, stating:
 
 
 17
 In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some "reasonable basis," it does not offend the Constitution simply because the classification "is not made with mathematical nicety or because in practice it results in some inequality."
 
 
 18
 Id. at 485, 90 S.Ct. at 1161.
 
 
 19
 In addition to all of this, the housing involved in this case is that which is provided by an educational institution which traditionally has been accorded a plenary exercise of discretion in the governance of the academic community. Thus, in a three-judge court opinion authored by Augustus Hand, it was held that the Board of Trustees of the State University of New York could ban national fraternities and sororities from the campus:
 
 
 20
 A state may adopt such measures, including the outlawing of certain social organizations, as it deems necessary to its duty of supervision and control of its educational institutions.
 
 
 21
 Webb v. State University of New York, 125 F.Supp. 910, 912 (N.D.N.Y.), appeal dismissed for lack of a substantial federal question, 348 U.S. 867, 75 S.Ct. 113, 99 L.Ed. 683 (1954). The Supreme Court has also consistently recognized the broad power of a school authority to formulate and implement educational policy. Thus the Court in Epperson v. Arkansas, 393 U.S. 97, 104, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968) said:
 
 
 22
 By and large, public education in our Nation is committed to the control of state and local authorities. Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values (footnote omitted).
 
 
 23
 To similar effect are Swann v. Charlotte-Mecklenburg Board of Educ., 402 U.S. 1, 16, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); Tinker v. Des Moines Indept. Community School Dist., 393 U.S. 503, 507, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); Presidents Council, Dist. 25 v. Community School Bd. No. 25, 457 F.2d 289, 291 (2d Cir.), cert. denied, 409 U.S. 998, 93 S.Ct. 308, 34 L.Ed.2d 260 (1972).
 
 
 24
 In a recent Eighth Circuit case, students at a state university contended that a housing regulation requiring all single freshman and sophomore students to live in university residence houses encroached upon their right of privacy and denied them equal protection of the law. In rejecting their contention the court commented:
 
 
 25
 ... we cannot agree that the right to choose one's place of residence is necessarily a fundamental right (citing Village of Belle Terre v. Boraas, supra).... Fundamental to our reasoning is the fact that we are dealing with education, an area in which "(s)chool authorities are traditionally charged with broad power to formulate and implement educational policy ... (citing Swann v. Board of Educ., supra)."
 
 
 26
 Prostrollo v. University of South Dakota, 507 F.2d 775, at 781 (8th Cir. 1974), rev'ing 369 F.Supp. 778 (D.S.D.1974).
 
 
 27
 In light of this abundant precedent it is clear that Judge Judd's adoption of the limited scrutiny test of Boraas is sound and that the appellees' espousal of a compelling interest test because of alleged interference with marital and child-rearing rights is unfounded.
 
 
 28
 Therefore we turn now to the application of the proper test to the facts before us.
 
 III. RATIONAL BASES
 
 29
 The state urges, as one rational basis for the promulgation of its regulation, the safety of the children who will be housed in quarters which concededly were not designed for family living. The danger to children includes such disasters as fire, a menace which is real and not invented by the University as an excuse to bar children. As we have indicated, there have been 53 fires on campus between January 1, 1973 and June 30, 1974. The record indicates that 25 of these were the result of cooking accidents involving grease or hot plates, which are employed to provide makeshift cooking arrangements in space not designed for such purposes. The court below conceded that "(s)afety has admittedly been sacrificed to some extent by the permission of cooking in resident facilities." Although the buildings are fireproof and have fire alarm equipment, Dr. Ackley, an assistant to the president of the University, testified that the University was especially concerned with the inability of children to leave their quarters in emergencies since there was no direct emergency exit from each of the suites as there might be from an apartment.[5] He also expressed the view that the University does want to provide facilities for married students who have children but that budgetary requests have been rejected annually. The attitude of the University seems to be that until facilities adequate to special family needs are provided, children should not be permitted to live on campus in present quarters. Dr. Ackley further testified that there were traffic problems and risks because of excessive construction work on campus which the University would have to approach differently if children were permitted to live on campus. It is not disputed that campus housing at Stony Brook was designed for full-time single student occupancy and that the use of suites for married students without children was on a trial basis.
 
 
 30
 In its answer to the complaint, the University also claimed that the habitual presence of children on campus in the housing then available would interfere with the academic environment and further that there was a lack of supportive community facilities on campus for family living. However, the court below found that there was no evidence to support the proposition that the presence of children would adversely affect the academic atmosphere and we cannot characterize this finding as clearly erroneous. With respect to supportive facilities such as play areas,[6] the court found that this constituted a reason for planning a family housing building, but not for preventing married students from bringing their children into the existing buildings. The court concluded that the regulation in question is not reasonably related to any college goal and is therefore invalid.
 
 IV. CONCLUSION
 
 31
 Although the court below purported to apply the appropriate limited scrutiny or rational relationship test, we find as a matter of law that the test was distorted and improperly applied. At the outset of the discussion the court stated: "It is understandable that the administration desired to provide thoroughly adequate facilities before offering them to families. The question for the court is whether this desire furnished a rational basis for excluding the children of couples who are willing 'to make do' with what is available." In view of the broad discretion vested in the University to fashion educational policy and to regulate the conduct of its students, the question is whether under the circumstances the University's concern for the safety of children habitually residing there is rational. The willingness and indeed the anxiety of parents to have the economic advantages as well as the convenience of this housing despite the risks are understandable but their preferences cannot usurp the jurisdiction and the responsibility of the University to make decisions so long as they have a rational basis. The court below in its opinion stated that "Parents should be able to judge the safety requirements of their children as well as the college administration." Whatever vitality the hoary axiom "Mother knows best" still may retain, it is submitted that it is irrelevant in the context of the rational basis test. The question is not whether mother or even the court knows what is best but whether the University's decision to keep children from living on campus until appropriate housing was available represented an arbitrary or irrational decision.[7]
 
 
 32
 We think that it was not and that the willingness of parents to "make do" with facilities which the court found less than optimal for even childless couples is not pertinent. Initially, we face the fact that the University has no obligation, academically or legally, to house any nonstudents. There is no case cited to us and none found which would compel a university to provide housing for the children of its students.[8] The fire hazard here alone would, in our view, provide a rational basis for the University position. When "make-do" cooking facilities precipitate grease fires, the fact that adults in the past have escaped injury is hardly predictive that infant children will possess sufficient physical coordination and mental acuity to avoid injury, particularly in housing with insufficient means of egress.[9] This approach is pejoratively characterized by the court below as a "perfectionist attitude;" even if this view is justified, the University position is hardly an irrational or unreasonable one. With a campus which has parking problems, no traffic lights and heavy construction in progress (one student fell to his death through an uncovered manhole), it is rational for the University, which will be legally responsible for its negligence, to postpone the residence of children until such time, if ever, that it can provide the housing it (and not the parents) deems adequate. There is no hint of bad faith on the part of the University, which is obviously trying to be responsive to the housing needs of its students. Finally we note that the plaintiffs here agreed in writing to abide by the regulations which clearly barred children's residence.
 
 
 33
 We think that the injunctive relief granted below rested on a mistaken application of the constitutional test and was improvident; therefore, it is reversed and the complaint is dismissed.
 
 
 
 *
 United States District Judge for the Southern District of New York, sitting by designation
 
 
 [1]
 Plaintiffs also asserted below due process violations and a breach of their residency agreement with the University. Both of these claims have been abandoned on this appeal
 
 
 [2]
 For every floor of suites there is a separate "tub room" in the hall
 
 
 [3]
 For this assertion we rely on plaintiffs' sole witness, Carolyn Woods, in fact one of the named plaintiffs herself. She was a married student living on campus with her child, who was approximately 18 months old at the time of their residence
 
 
 [4]
 Rents off-campus are in the range of $235/month for a family with one child. By comparison, two and three-bedroom on-campus suites rented for $158.75 and $191.15, respectively, for the period in question here
 
 
 [5]
 The testimony of Dr. Daniel Giovanetti, chief program coordinator for the Dormitory Authority, State of New York, indicated that for dormitories, the rule is that no door shall be more than 100 feet from an exit stair; however, in housing for families, "the design would require that the exit stair (be) a lot closer than that to an entrance to an apartment."
 
 
 [6]
 The opinion does not mention shopping facilities; however the plaintiffs' only witness did testify that she had to shop in town
 
 
 [7]
 Note that there are several cases which uphold a disparity in treatment between children and adults. E. g., Ginsberg v. New York, 390 U.S. 629, 640, 88 S.Ct. 1274, 1281, 20 L.Ed.2d 195 (1968) (statute making it unlawful to sell pornography to minors under 17, but not to adults, held constitutional. " 'It is ... altogether fitting and proper for a state to include in a statute designed to regulate the sale of pornography to children special standards, broader than those embodied in legislation aimed at controlling dissemination of such material to adults' " (citation omitted).); Prince v. Massachusetts, 321 U.S. 158, 168, 64 S.Ct. 438, 443, 88 L.Ed. 645 (1944) (state child labor law that prohibited the sale by minors (boy under 12 or girl under 18) of periodicals in streets or other public places held constitutional. "The state's authority over children's activities is broader than over like actions of adults.") See also Waugh v. Duke Corp., 248 F.Supp. 626, 629 (M.D.N.C.1966) ("the duty of an innkeeper to a guest who is an infant is a greater duty than that owing to his adult guests and he is bound to consider whether his premises, although safe enough for an adult, present any reasonably avoidable
 
 
 [8]
 Quaere: if such housing were mandated could unmarried students claim that the exclusion of their offspring also presented an equal protection question? Could the lonesome freshman successfully petition for a suite for his parents?
 
 
 [9]
 The fact that children are permitted to visit the campus until 9 p. m. does not strike us as representative of an inconsistent University position. Habitual residence and sleeping in the quarters we have described present a greater menace and danger to life and limb than mere visiting during hours of wakefulness