649 F.Supp. 1393 (1986)
Todd FOX, Edward R. Detweiler, Stephanie Vaiano, James B. Cullen, Christine Marie Odell, Steven Gawley, Daniel Altman, Philip Jay Botwinik, Jeffrey S. Zellan, Jaclyn Bertstein, and American Future Systems, Inc., Plaintiffs,
v.
The BOARD OF TRUSTEES OF the STATE UNIVERSITY OF NEW YORK and Clifton R. Wharton, Jr., Individually and as Chancellor of the Board of Trustees, and the State University of New York College at Cortland, and James M. Clark, Individually and as President of the College at Cortland, and the State University of New York at Binghamton, and Clifford D. Clark, Individually and as President of the State University of New York at Binghamton, and the State University of New York at Albany, and Vincent O'Leary, Individually and as President of the State University of New York at Albany, and the State University of New York College of Arts and Sciences at Potsdam, and Humphrey Tomkin, Individually and as President of the College of Arts and Sciences at Potsdam, Defendants.
No. 82-CV-1363.
United States District Court, N.D. New York.
December 12, 1986.
*1394 Ronald H. Sinzheimer, Albany, N.Y., Duane Morris & Heckscher, Philadelphia, Pa., for plaintiffs; Henry T. Reath, of counsel.
Robert Abrams, Atty. Gen. of the State of N.Y., Albany, N.Y., for defendants; Lawrence Doolittle, Asst. Atty. Gen., of counsel.

MEMORANDUM-DECISION AND ORDER
McCURN, District Judge.
American Future Systems, Inc. (AFS) and several students of the State University of New York (SUNY) have brought this action for declarative and injunctive relief against the Board of Trustees of the State University of New York, the Chancellor of the State University, and several individual constituent colleges of the State University and their respective presidents. The gravamen of the complaint is that the defendants have refused to permit AFS to conduct product demonstrations in campus dormitory rooms, even when invited to do so by the students. The plaintiffs assert that such action by the defendants unconstitutionally deprives AFS and the students of their first amendment free speech rights.
A non-jury trial on the merits was held by the court between September 24 and October 1, 1986. Following are the court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52.

*1395 I. FINDINGS OF FACT
AFS is a corporation engaged in selling cookware, china, crystal, and silverware to college students through group demonstrations. Such group demonstrations are arranged by personal contact with students. Personal contact is initiated in several ways. An AFS representative may obtain names and telephone numbers of students from student directories, bulletin boards, referrals by other students, or through a procedure called "chatterbooking". In "chatterbooking," an AFS representative invites students in common areas of the campus to register for a vacation drawing. Students are required to list their names and telephone numbers on the drawing cards. This information is in-turn used for the booking procedure.
Once the student names and telephone numbers are obtained, the representative or one of twenty AFS "booking agents" will make a telephone call in an attempt to arrange a demonstration. The student is encouraged to permit AFS to conduct a demonstration in the student's own living quarters before his or her friends. To encourage the student's participation, AFS informs the student that by hosting a show he or she can obtain a free vacation to Florida or another resort. AFS also informs the student of its policy of donating money to "Save the Children" for each attendee at the demonstration. If the student agrees, a group demonstration is arranged.
The instant controversy arose because SUNY enforced a policy that prohibits AFS demonstrations from occurring in students' dormitory rooms. That policy, SUNY Resolution 66-156, as amended, provides:
No authorization will be given to private commercial enterprises to operate on State University campuses or facilities furnished by the University other than to provide for food, campus bookstore, laundry, dry-cleaning, barber and beauty services, and cultural events.[1]
The policy was enforced, with respect to AFS, when an AFS representative conducting a demonstration in a dormitory room at SUNY-Cortland on October 17, 1982 was told to leave by campus authorities. The following day, the AFS Regional Director, Kathy Rapp, entered the dormitory to give a demonstration. The dormitory director came into the room when Rapp was consummating sales, and told Rapp to leave the premises. Rapp replied that she had a constitutional right to stay. The campus police arrived and again told Rapp to leave, and she again refused. The officers then arrested Rapp on charges of loitering and soliciting without a permit. A charge of trespass was later added. Subsequently, another student, Todd Fox, agreed to host an AFS presentation in his dormitory room. He first requested permission from defendant Raymond Franco, Director of Residential Life at SUNY-Cortland. Franco responded by letter denying Fox permission to host the demonstration and stating that legal action, other than arrests, would be taken if any such demonstration were held.
In order to challenge the SUNY resolution and its enforcement at SUNY-Cortland, AFS, Kathy Rapp, and Todd Fox commenced this suit on December 2, 1982. In June of 1983, this court enjoined defendants from prohibiting AFS from demonstrating its products in the dormitory rooms of SUNY-Cortland students. American Future Systems, Inc. v. State University of New York, 565 F.Supp. 754 (N.D.N.Y.1983). The court refused, however, to enjoin the defendants from prohibiting the actual sale of AFS products. Id. In addition, the court noted: "Nothing in this Order shall restrain defendants from promulgating and enforcing reasonable restrictions governing the time, place, and manner of such demonstrations." Id. at 771. In response, SUNY-Cortland promulgated the following regulations:

*1396 COMMERCIAL PRESENTATIONS BY REPRESENTATIVES OF AMERICAN FUTURE SYSTEMS, INC.
The following regulations are established in accordance with the June 3, 1983 preliminary injunction Order entered by the Honorable Neal P. McCurn, U.S. District Judge for the Northern District of New York pending final determination in the American Future Systems, Inc., et al. v. State University of New York College at Cortland, et. al. case.
Where a student residing in College housing elects to invite an American Future Systems, Inc. representative into his/her room to conduct, host or participate in a commercial presentation, such presentation will be allowed only in accordance with the regulations outlined below. No commercial activity involving the consummation of sales will be allowed on the College premises. CONSUMMATION OF SALES SHALL INCLUDE ACTIVITY SUCH AS THE TRANSFER OF CASH, CHECKS OR MONEY ORDERS IN EXCHANGE FOR PRODUCTS; THE USE OF CREDIT CARDS FOR THE PURCHASE, LEASE OR RENTAL OF PRODUCTS, AND/OR ENTERING INTO AGREEMENTS (EITHER WRITTEN OR ORAL) FOR THE PURCHASE, LEASE OR RENTAL OF PRODUCTS.
If violations occur in relation to this sales prohibition and/or compliance with these regulations, the resident who issued the invitation and all other residents involved may be subject to appropriate disciplinary action. American Future System, Inc.'s representative(s) may be subject to ejectment and may also be excluded from further entry into College premises.
TIME
Commercial presentations given by invited American Future Systems, Inc. representatives will be limited to certain hours. During the year when residence halls are open to students, such presentations are permitted between 2:00 and 9:00 P.M. except during exam periods, when they conflict with study hours established by individual residence hall governance committees.
PLACE
No commercial presentations by American Future Systems, Inc. representative(s) are allowed in common areas of the residence halls. Only presentations in student rooms-with written permission from all roommates/suitemates and in accordance with stated rules and regulations governing such presentations-will be permitted. The number of participants will be limited to ten (10).
MANNER
Commercial presentations by American Future Systems, Inc. representatives will be allowed if they are by resident invitation and if a registration form is satisfactorily completed. All information and signatures requested on the registration form must be provided and submitted to the Director of Residence Life or designee by 12:00 P.M. (Noon) of the working day prior to the presentation.
The resident who has invited the American Future Systems, Inc.'s representative into the residence hall to give a presentation is responsible for the conduct of his/her guest and must be present during the duration of the visit.
The pleadings have been amended several times throughout the prosecution of this action. The presidents of SUNY-Potsdam, SUNY-Albany and SUNY-Binghamton have been added as defendants. Consistently, the court's preliminary injunction of 1983 was extended to the additional defendants by this court's order of April 15, 1984.[2] The amended pleadings challenge both the initial SUNY Resolution 66-156, and the Cortland interim regulation described above. The plaintiffs claim that Resolution 66-156 violates the pure and commercial speech rights of the student plaintiffs,[3] as well as the commercial speech rights of AFS.[4] In addition, they *1397 claim that enforcement of the Cortland interim regulations has deprived both the students and AFS of due process of law.[5] The plaintiffs have also changed. Kathy Rapp is no longer a named plaintiff, while several student plaintiffs have been dropped and others added, dependent upon their matriculation at the various state colleges.

II. CONCLUSIONS OF LAW
Defendants assert that this court has no jurisdiction over the claims against the various SUNY Colleges: SUNY-Cortland, SUNY-Potsdam, SUNY-Albany, and SUNY-Binghamton. The court agrees that the eleventh amendment bars the action against the named colleges. While the eleventh amendment does not bar the federal claims for prospective injunctive relief against SUNY officials, Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 102-03, 104 S.Ct. 900, 909, 79 L.Ed.2d 67 (1984), claims against a state or one of its agencies are barred, in the absence of consent, regardless of the nature of the relief sought, id. at 100-01, 900 S.Ct. at 908. The court is aware of no consent by the State of New York to this suit or similar suits. Furthermore, it is clear that SUNY is considered to be the State for eleventh amendment purposes. Williams v. State University of New York, 635 F.Supp. 1243, 1249-50 (E.D.N.Y.1986); Lachica v. Jaffe, 578 F.Supp. 83, 84-85 (E.D. N.Y.1983).
Defendants also assert that claims of certain student plaintiffs are moot as these students no longer live in the dormitories. The court need not address this contention because at least some of the plaintiffs still reside in the dormitories. Consequently, a live "case or controversy" is presented to this court.
It is axiomatic that students are entitled to their constitutional right of free speech. They do not "shed their constitutional rights to freedom of speech or expression at the school house gate." Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969). It is also clear that the first amendment accords commercial enterprises a level of protection to ply their trade. Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 762, 96 S.Ct. 1817, 1825-26, 48 L.Ed.2d 346 (1976). Equally beyond dispute is that the Constitution protects the citizens' right to listen as well as to speak. Id. at 756-57, 96 S.Ct. at 1822-23. Consequently, implicated here are the first amendment rights of AFS to ply its trade and of the students to receive information from AFS.
The Supreme Court has also "repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct within the schools." Tinker, 393 U.S. at 507, 89 S.Ct. at 737. The facts of this case implicate SUNY's comprehensive authority to regulate conduct on SUNY campuses to carry out the educational mission of the University. The question before the court is whether SUNY has exercised its comprehensive authority, by promulgating and enforcing the regulations in question, in a manner which unconstitutionally infringes on the first amendment rights of AFS and the students.

A. Applicable Standard

The Supreme Court has utilized several tests in first amendment cases to resolve the conflict between the competing interests of the state and the citizenry. See J. Nowak, R. Rotunda & J. Young, Constitutional Law, 864-73 (2d ed. 1983). The threshold question is which of these tests should this court apply here.
In 1983, the court issued a preliminary injunction in this case partially in favor of the plaintiffs. See AFS v. SUNY, 565 F.Supp. 754. In so doing, the court determined that the applicable standard was the commercial speech standard announced by the Supreme Court in Central Hudson Gas & Electric v. Public Service *1398 Comm'n, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980).[6] The court adopted the commercial speech standard because it was completely unconvinced by the record before it that the speech in question was pure as opposed to commercial. After trial, the court remains unconvinced. While it may be true that some of the students may receive pure speech information from AFS demonstrations, it cannot be reasonably controverted that the bulk of such a demonstration concerns speech directed toward a commercial transaction, the sale of AFS products. Therefore, the speech in question is properly characterized as commercial speech. Virginia State Board of Pharmacy, 425 U.S. at 762, 96 S.Ct. at 1825-26. This characterization is correct even though the speech may have some non-commercial elements. Bolger v. Youngs Drug Products Corp., 463 U.S. 60, 65-68, 103 S.Ct. 2875, 2879-81, 77 L.Ed.2d 469 (1983); American Future Systems v. Pennsylvania State University, 752 F.2d 854, 860-62 (3d Cir.1984).
The court is similarly unconvinced that the speech at issue can be characterized as commercial with respect to AFS and pure with respect to the students. Although the "motivation of the listeners may occasionally be relevant to a conclusion about whether the speech is commercial, the essential nature of the speech remains unchanged regardless of whose rights are being adjudicated." AFS v. Penn State, 752 F.2d at 862. The speech rights of both the students and AFS are correctly characterized as commercial speech rights.[7]AFS v. SUNY. 565 F.Supp. at 762-63.
Characterizing the speech in question as commercial does not end the search for an appropriate test, however.[8] This court is, as the Third Circuit was in Penn State, confronted with an unusual situation: "the intersection between government regulation of commercial speech and regulation of speech on government property." AFS v. Penn State, 752 F.2d at 862. The former is controlled by Central Hudson and its progeny; the latter is controlled by cases *1399 that distinguish between government property that is used as a public forum and that which is not so used. See e.g. Perry Education Association v. Perry Local Educators, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). While the Third Circuit declined to apply the public forum test because it believed that dormitory rooms do not fit neatly into either the public forum or non-public forum mold, AFS v. Penn State, 752 F.2d at 863, this court concludes that the public forum standard is the most appropriate standard in this instance.
The court now subscribes to the public forum approach for several reasons. First, in applying the public forum doctrine to a case involving the use of a municipal stadium, the Second Circuit recently noted that, "recognition that protected speech is involved only begins the inquiry, since `[e]ven protected speech is not equally permissible in all places and at all times.'" Calash v. City of Bridgeport, 788 F.2d 80, 82 (2d Cir.1986) quoting Cornelius v. NAACP Legal Defense and Education Fund, 473 U.S. 788, 105 S.Ct. 3439, 3448, 87 L.Ed.2d 567 (1985). Here, the court must decide whether protected commercial speech must be permissible in a state university dormitory. Second, other courts have made similar determinations using the public forum doctrine. See e.g. Glover v. Cole, 762 F.2d 1197 (4th Cir.1985) (Enforcement of a state-wide policy prohibiting on-campus sales and fund raising activities by groups not sponsored by students or the college did not violate first amendment rights of individuals seeking to engage in such activities); Chapman v. Thomas, 743 F.2d 1056 (4th Cir.1984) (University policy prohibiting door-to-door solicitation in its dormitories did not violate students' first amendment rights.) Finally, the rationale for the commercial speech line of cases is not applicable here, while the rationale for the public forum doctrine is relevant.
Commentators have explained that the rationale behind the commercial speech line of cases is to strike a balance between the government's interest in the regulation of business and commercial enterprises and the consumer's interest in the free market of information. See J. Nowak, supra at 928-43. Here, although SUNY expresses an interest in protecting its students from commercial exploitation, such an interest is not the primary motivation in the enforcement of the relevant regulations. The University is more concerned with maintaining the dormitories for their intended purposes. This concern is the fundamental reason for the application of the public forum doctrine which involves determining appropriate places and times for speech activities. See Perry, 460 U.S. at 44-49, 103 S.Ct. at 954-57.
In considering whether the regulations in question unconstitutionally infringe on the first amendment rights of AFS and the students under the public forum doctrine, the court turns to the teaching of the Second Circuit in Calash:
[T]he Supreme Court has defined three categories of public property: the traditional public forum, including public streets and parks, dedicated to assembly and debate by "tradition or by government fiat;" the limited public forum, which the government has designated as "a place or channel of communication for use by the public at large ... [or] for use by certain speakers, or for the discussion of certain subjects;" and the nonpublic forum, which is not "by tradition or designation a forum for public communication." The right to access to government property and the standards by which limitations on access must be evaluated vary according to the classification.
In the first category, the government must show that a content-based exclusion is necessary to serve a compelling state interest and narrowly drawn to achieve its purpose. The government can also impose narrow, content-neutral time, place and manner restrictions to serve a significant interest, so long as there remain adequate alternative channels of communication. With regard to the second category, although the government can close a limited public forum altogether, the Supreme Court noted that when the forum remains open to the public as a whole it is governed by the same standards as the traditional *1400 public forum. When the government, however, creates a limited public forum for the use of certain speakers or for the discussion of certain subjects, the first amendment protections provided to traditional public forums only apply to entities of a character similar to those the government admits to the forum. In the third category, the government can "reserve the forum for its intended purposes, communicative or otherwise" through reasonable restrictions on expression, so long as the regulations are not based on hostility to the speaker's views. Indeed, "[i]mplicit in the concept of the nonpublic forum is the right to make distinctions in access on the basis of subject matter and speaker identity." Calash, 788 F.2d at 82 (citations omitted).

B. Application of the Public Forum Standards

The first step in the analysis is to determine the character of the SUNY dormitories because the permissible limitations on the use of public property for expressive activity depends on the character of the property at issue. Perry, 460 U.S. at 45, 103 S.Ct. at 955. The court agrees with the Third Circuit majority in Penn State that dormitory rooms do not fit easily into either the public forum or non-public forum classifications. AFS v. Penn State, 752 F.2d at 863. Nevertheless, the court does not shy away from the task.
Public forums are "places which by long tradition or by government fiat have been devoted to assembly and debate." Perry, 460 U.S. at 45, 103 S.Ct. at 955. Although, "the campus of a public university, at least for its students, possesses many of the characteristics of a public forum," Widmar v. Vincent, 454 U.S. 263, 267 n. 5, 102 S.Ct. 269, 273 n. 5, 70 L.Ed.2d 440 (1981), this court concludes that student dormitory rooms do not constitute such public forums. There is no evidence to suggest that residence halls, unlike open areas on campus, have been devoted to assembly and debate. On the contrary, the plethora of regulations produced at trial demonstrate that the use of residence halls has been highly regulated.[9]
There is considerable authority, on the other hand, for the conclusion that university dormitories are non-public forums. In Chapman, the Fourth Circuit considered a student's claim that his university's policy of prohibiting door-to-door solicitation violated his first amendment rights. In applying the public forum doctrine, the court noted:
The public property at issue here, residential areas of dormitories located on the campus of a state institution of higher learning, which has not by tradition or designation ever constituted a public forum for communicative purposes must be placed in the category of nonpublic forums. Chapman, 743 F.2d at 1059.
Furthermore, the concurring opinion of Judge Adams in Penn State concludes that the dormitories at Penn State were non-public forums. AFS v. Penn State, 752 F.2d at 870-71 (Adams, J., concurring).
A conclusion that SUNY dormitories are non-public forums goes too far, however. The Second Circuit recently noted in Calash that the government may create a public forum for limited purposes. Calash, 788 F.2d at 83. SUNY has done so here.
The crucial factor in determining whether a limited public forum exists is the government's intent. "The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a non-traditional forum for public discourse." Id. (quoting Cornelius, 105 S.Ct. at 3449). Relevant in determining the government's intent are the circumstances under which the forum was created and past use of the forum. Calash, 788 F.2d at 83. While there was *1401 no evidence presented at trial regarding the creation of the dormitories, there was considerable testimony regarding their past use. Administrators and students alike testified that the dormitories have been used for a variety of social, cultural and educational activities. There can be no doubt that SUNY intended the dormitories to be used in such a manner. Therefore, the dormitories are limited public forums, at least with respect to the students, for the participation in social, cultural, and educational activities.
SUNY has not created a public forum for the commercial speech at issue here, however, SUNY's intent in maintaining a traditional non-public forum in that respect is abundantly clear. Resolution 66-156, in force for twenty years, demonstrates SUNY's intent to restrict commercial activity. Residence hall rules and regulations, agreed to by each resident, that prohibit such activity further demonstrates this intent.[10]
The University's decision to create a public forum for non-commercial activities, while maintaining a non-public forum for commercial activities, is proper. In Calash, the Second Circuit opined that "a public forum can be created for use only by certain speakers or for discussion of certain topics." Calash, 788 F.2d at 84, citing Perry, 460 U.S. at 46 n. 7, 103 S.Ct. at 955 n. 7. The Calash court determined that the City of Bridgeport could limit the use of its stadium to "civic, charitable, and non-profit speakers." Calash, 788 F.2d at 84. In addition, the Fourth Circuit recently decided that the campus of West Virginia State College was a public forum for the limited purpose of enriching the educational community, but non-public for commercial activity by non-student groups. Glover, 762 F.2d at 1201 & n. 7. SUNY can similarly limit the use of its dormitories to non-commercial activities.[11]
Classification of the SUNY dormitories as non-public forums for commercial activity does not end the inquiry. Calash, 788 F.2d at 84. As previously indicated, restrictions on the use of a non-public forum must be viewpoint-neutral and reasonable in relation to the forum's purpose. There can be no doubt that the restriction contained in 66-156 is viewpoint-neutral. Defendants testified that the regulation is applied even-handedly to pizza vendors, AFS, doctors, lawyers and any other person or entity motivated by profits. The University does not single out AFS. The University does permit student groups to conduct sales on campus, however. Such a distinction is not fatal. Distinctions based on speaker identity are permitted in non-public forums. See e.g., Cornelius, 105 S.Ct. at 3453 (distinction between charitable agencies providing direct services and legal defense and political advocacy organizations considered reasonable); Perry, 460 U.S. at 50-53, 103 S.Ct. at 958-59 (exclusion of one rival union reasonable); Lehman v. City of Shaker Heights, 418 U.S. 298, 304, 94 S.Ct. 2714, 2718, 91 L.Ed.2d 770 (distinction between commercial and political advertising reasonable).
There was controversy at trial as to whether the restriction is reasonably related to the forum's purpose, however. The plaintiffs presented testimony of expert educators to prove that the Resolution was unnecessary and unreasonable. For example, Dr. Krafft testified that the experience obtained by a student at an AFS demonstration was educational, and that the Resolution unnecessarily deprived students of the experience. Dr. Wachtman testified that the total ban of commercial activities *1402 was overbroad, and that SUNY could accomplish its objectives of assuring student safety and preserving an educational atmosphere through less restrictive means. Mr. Diamond, an Administrator at the University of Illinois, testified that a more narrowly drawn regulation, which permitted the kind of demonstration conducted by AFS, was successfully implemented at his campus. The plaintiffs also presented lay testimony to prove that the Resolution was unreasonable. Several AFS employees testified that many universities throughout the country permit AFS demonstrations, and that by and large the demonstrations are presented without complaint. Student plaintiffs and other students relayed that they desired to attend AFS demonstrations and that they believed that SUNY's policy was unreasonable, particularly because they knew of more disruptive activity than an AFS demonstration occurring in the dormitories.
On the other hand, the defendants offered testimony to establish the reasonableness of the total ban on commercial activity contained in Resolution 66-156. Various administrators within the SUNY system testified that in their opinion a total ban on commercial activity was necessary to (1) preserve the educational environment of the dormitories, (2) assure student safety, (3) prevent commercial exploitation of students, (4) avoid the use of tax supported facilities for private commercial gain, and (5) prevent overcrowding in the dormitories. For example, Dr. O'Leary, President of SUNY-Albany, testified that many commercial enterprises desired to utilize campus facilities to tap the student market. Dr. O'Leary believed that a total ban was necessary to prevent the commercialization of the campus, which would detract from its educational environment. Furthermore, Dr. Franco, Director of Residence Life at SUNY-Cortland, testified that lifting the total ban would require extensive security and registration requirements at a prohibitive cost to the University and its students.
Although there is support in the record for the plaintiffs' position that a less restrictive measure might better balance the respective interests of the parties, there is no requirement here that the government's method of restriction be the best solution; it need only be reasonable. Cornelius, 105 S.Ct. at 3453. Dr. Morris, one of the plaintiffs' experts, admitted that there are differences of opinion with regard to educational policy. SUNY's position on commercial activities is one such reasonable opinion, which this court is hesitant to second-guess.[12]
This court cannot conclude that the total ban of commercial activity envisioned by Resolution 66-156 is unreasonable. The plaintiffs' challenge of Resolution 66-156 must therefore fail. Because the interim regulations were enacted solely in response to this court's preliminary injunction, which is of course now lifted, the plaintiffs' challenge with respect to those regulations no longer presents a controversy for this court to decide. Accordingly, the complaint herein is dismissed and judgment is granted for defendants.
IT IS SO ORDERED.
NOTES
[1] The defendants have stipulated that the policy prevents AFS demonstrations in dormitory rooms.
[2] Unlike SUNY-Cortland, the additional defendants apparently have not promulgated time, place and manner restrictions.
[3] See Amended Complaint, Counts I and II.
[4] See Amended Complaint, Count III.
[5] See Amended Complaint, Counts IV and V. The "due process of law" claim is that the interim regulations do not constitute reasonable time, place and manner restrictions.
[6] The Central Hudson Court defined the test as follows:

At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest. Central Hudson, 447 U.S. at 567, 100 S.Ct. at 2352.
In applying the Central Hudson test to the facts available on the motion for a preliminary injunction, the court determined that the AFS demonstrations concerned lawful activity. AFS v. SUNY, 565 F.Supp. at 764-64. The court also determined that the interests of the University in (1) preventing disruption; (2) protecting the safety and security of the students; and (3) protecting students from commercial exploitation were legitimate and substantial. Id. at 764-65. Finally, the court determined that while the complete ban on commercial activities directly advanced the University's interests, it was, on the facts at hand, more extensive than necessary to serve those interests. Id. at 765-67.
[7] The plaintiffs place considerable emphasis on the fact that the AFS demonstrations result from "invitations" made by the students. They argue that such "invitations" distinguish this case from the commercial speech cases which involve unsolicited mass mailings. See Bolger, 463 U.S. at 2885, 103 S.Ct. at 75-76 (Rehnquist, J. & O'Connor, J. concurring). The distinction may have some merit under different facts. Here, however, the court concludes that the "invitations" in question resulted from unsolicited mailings and telephone calls promising vacations and other gifts. Using "common sense", the plaintiffs should not be permitted to distinguish this case on the basis of such induced invitations. The Supreme Court has encouraged such a "common sense" approach in the "commercial speech" area. See Zauderer v. Office of Disciplinary Counsel, 471 U.S. 626, 105 S.Ct. 2265, 2275, 85 L.Ed.2d 652 (1985).
[8] In AFS v. SUNY this court did end the search for an appropriate standard once it characterized the speech in question as commercial. The court applied the Central Hudson test. The application of Central Hudson, therefore, became the "law of the case". The court is not now bound to apply Central Hudson, however. The "law of the case" does not rigidly bind a court to its former decisions, and it can be modified when justice requires. Uniformed Sanitation Men Assoc., Inc. v. Comm'r of Sanitation, 462 F.2d 619 (2d Cir.1970), cert. denied, 406 U.S. 961, 92 S.Ct. 2055, 32 L.Ed.2d 349 (1972).
[9] The Supreme Court recognized the power of a University to regulate its campus in Widmar:

[a] university differs in significant respects from public forums such as streets or parks or even municipal theaters. A university's mission is education, and decisions of this Court have never denied a university's authority to impose reasonable regulations compatible with that mission upon the use of its campus and facilities. Widmar, 454 U.S. at 267 n. 5, 102 S.Ct. at 273 n. 5.
[10] The court does not imply that by signing a residential "license" the student waives his constitutional rights. Such a waiver would not be valid. Piazzola v. Watkins, 442 F.2d 284, 289 (5th Cir.1971). The students' agreement is not irrelevant, however. See Bynes v. Toll, 512 F.2d 252 (2d Cir.1975). Here, the agreement demonstrates that the students were aware that SUNY did not open the dormitories as forums for commercial speech.
[11] The plaintiffs offered uncontroverted testimony that commercial activity, like book sales and tutoring, occurs in the dormitories. Such evidence does not mandate that a public forum for commercial activity has been created, however. As noted in the text, government does not create a public forum by inaction or by permitting limited discourse.
[12] The court is particularly hesitant to second-guess defendants given the broad power of the states to formulate and implement educational policy, see Bynes, 512 F.2d at 256, and to control its university facilities, see Widmar, 454 U.S. at 273 n. 5, 102 S.Ct. at 276 n. 6.